FRIENDS OF THE CLEARWATER; Idaho Sporting Congress, Inc.; The Northern Rockies Preservation Project; and The Ecology Center, Plaintiffs–Appellants,

Gary MacFarlane; Ron Mitchell; Dan Funsch; and Natalie Shapiro, Plaintiffs,

v.

Michael DOMBECK, in his official capacity as Chief of the United States Forest Service; and United States Forest Service, an agency of the United States Department of Agriculture, Defendants–Appellees,

Shearer Lumber Products, Intervenor–Defendant–Appellee.

No. 99–35642.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 2000

Filed Aug. 16, 2000

Marc D. Fink, Western Environmental Law Center, Eugene, OR, for plaintiffs-appellants.

Nicholas J. Woychick, Assistant U.S. Attorney, Boise, ID, for defendants-appellees.

Bruce M. Smith, Moor Smith Buxton & Turcke, Chtd., Boise, ID, for intervenor-defendant-appellee.

Before: HUG, Chief Judge, BRUNETTI, and GOULD, Circuit Judges.

GOULD, Circuit Judge:

Friends of the Clearwater, Idaho Sporting Congress, Inc., the Northern Rockies Preservation Project, and the Ecology Center (collectively, "FOC") appeal the district court's grant of summary judgment to the United States Forest Service in connection with the Forest Service's refusal to prepare a supplemental environmental impact statement ("SEIS") for certain timber sales in the Nez Perce National Forest. FOC asks us to reverse the summary judgment and order the district court to enjoin the Forest Service from proceeding with the timber sales until it completes an SEIS. We hold that at the time this action was commenced, the Forest Service had failed adequately to assess the need for an SEIS, in violation of the National Environmental Policy Act ("NEPA"). After the onset of this litigation, however, the Forest Service explicitly considered the need for an SEIS and properly concluded, based on adequate data reasonably evaluated, that no SEIS is necessary. Accordingly, we affirm on the ground that FOC is not entitled to the injunctive relief it seeks.

## FACTS AND PROCEDURAL HISTORY

The Nez Perce National Forest occupies approximately 2.2 million acres in north-central Idaho. It extends east-west virtually from the Washington border to the Montana border, and is bounded to the north by the South Fork of the Clearwater River, and on the south by the Gospel–Hump Wilderness Area. Nearly half of the forest is classified as wilderness, and it contains approximately 150 miles of rivers classified under the Wild and Scenic Rivers Act.

In October 1987, the Forest Service completed a forest plan and programmatic

environmental impact statement ("EIS"), which set out goals, objectives, and management practices for the entire forest. In July 1989, the Forest Service completed a site-specific EIS for four proposed timber sales within Wing Creek–Twentymile Analysis Area, a 52,000 acre parcel within the forest, just north of the Gospel–Hump Wilderness. The final Record of Decision approved the four sales, with a harvest totaling 51.95 million board feet of timber on 2,425 acres of primarily old growth forest. Two of those sales—the 4–6 Mile sale and the Twentymile sale—were awarded and completed before the onset of this litigation. The remaining sales—Mackey Day and Otter Wing—were not awarded until 1996, and have not yet been completed, mainly because of delays caused by the Forest Service's need to modify the sales in response to the listing under the Endangered Species Act of certain aquatic species found in the sale areas.[1]

In June 1998, individuals and environmental groups, including the plaintiffs in this action, wrote the Forest Service. They noted that it had been more than ten years since the Forest Service completed the original Wing Creek–Twentymile EIS, and that during that time the steelhead, chinook salmon, and bull trout had been listed under the Endangered Species Act, the lynx had been proposed for listing, and endangered grey wolves had been reintroduced into central Idaho. The writers contended that these changes had rendered the EIS out of date, and demanded that the Forest Service prepare a supplemental EIS to reconsider the environmental effects of the two remaining timber sales in light of the changed status of the species mentioned in the letters.

The Forest Service responded that it was not required to prepare an SEIS because it already had determined that the changes noted were not significant with respect to the sales, or that it already had modified the sales to reduce their impacts on the newly listed species noted by the letter writers. In 1996 and 1997 the Forest Service had prepared two supplemental information reports ("SIRs"), which are the Forest Service's formal instruments for documenting whether new information is sufficiently significant to trigger the need for an SEIS. *See* Forest Service Handbook ("FSH") 1909.15 § 18.1. It prepared a third SIR shortly after receiving the June 1998 letters. These SIRs evaluated changes that were being made to the timber sales in response to listings of the species identified in the June 1998 letters. The reports concluded that the new information about these species did not require preparation of an SEIS. The plaintiffs sued, challenging the Forest Service's denial of their demands that it prepare an SEIS.

During the litigation in the district court the plaintiffs changed their explanation of the need for an SEIS. Rather than focusing on the species identified in the June 1998 letters, the plaintiffs raised two new issues. First, they noted that in 1994, 1996, and 1999, the Forest Service had designated as "sensitive" seven species, six of which were not mentioned in the pre-litigation letters: the flammulated owl, white-headed woodpecker, black-backed woodpecker, pine martin, fisher, lynx, and northern goshawk. Sensitive species are "those species whose viability is of concern because they have significant current or predicted downward trends in numbers or density, or because there is a significant downward trend in their current or predicted habitat that would reduce their distribution." *Friends of the Wild Swan, Inc. v. United States Forest Service,* 966 F.Supp. 1002, 1009 (D.Or.1997); *see also* Forest Service Manual ("FSM") § 2670.5(19). Because of the precarious status of species designated as sensitive, FOC contended that the seven new sensitive species designations constituted signif-

---

1. Besides altering where and how timber would be harvested, these changes have reduced the total acreage to be harvested by about 40%, and the total volume of timber to be harvested by about 50%.

icant new information that should be considered in an SEIS.[2]

Second, the plaintiffs noted that in March 1998 the Forest Service published a document—the South Fork Clearwater River Landscape Assessment ("South Fork Assessment")—in which it (a) acknowledged that the Nez Perce Forest Plan's standards for old growth and snags, on which the Wing Creek–Twentymile EIS had relied, were inadequate, and (b) recommended interim standards and further analysis. *See* 1 South Fork Assessment 167, 209. Because adequate standards for old growth and snags are important to maintain viable populations of species that depend on such habitat, FOC contended that the Forest Service's recognition that the original standards were inadequate required preparation of a supplemental EIS.[3]

Following cross-motions for summary judgment, the district court granted summary judgment to the Forest Service, finding that data existed in the original EIS and the South Fork Assessment that supported the Forest Service's decision to forego an SEIS. This appeal followed.

## DISCUSSION

### I

■ We review de novo the district court's grant of summary judgment that

no SEIS was required. *See Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir.1994). The Forest Service's decision to forego an SEIS should not be set aside unless it was arbitrary or capricious. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). We "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 378, 109 S.Ct. 1851 (internal citations and quotations omitted). "Review under this standard is to be searching and careful, but remains narrow, and a court is not to substitute its judgment for that of the agency. This is especially appropriate where, as here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993) (citations and quotations omitted); *see also United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989) ("Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters.").

### II

■ NEPA requires federal agencies to prepare an EIS for all "major Federal

---

**2.** The designation of a species as sensitive arises from the Forest Service's obligations under the National Forest Management Act ("NFMA"), 16 U.S.C. § 1601 *et seq.* Pursuant to § 1604(g)(3)(B), the Forest Service is required to "provide for diversity of plant and animal communities." Regulations promulgated under NFMA require, more specifically, that the Forest Service manage habitat under its jurisdiction to "maintain viable populations of existing native and desired non-native vertebrate species." 36 C.F.R. § 219.19. To implement this requirement, the Forest Service periodically designates certain species as "sensitive." *See Inland Empire Pub. Lands Council v. United States Forest Service*, 88 F.3d 754, 759 (9th Cir.1996). The Forest Service's duty to maintain viable populations "applies with special force to 'sensitive' species." *Id.* (citation and quotation omitted), and the Forest Service Manual requires that "[s]ensitive species of native plant and animal species must receive special management em-

phasis to ensure their viability and to preclude trends toward endangerment that would result in the need for Federal listing." FSM § 2672.1.

**3.** Old growth, as the name implies, is habitat dominated by mature trees that can be hundreds of years old. *See* Final Environmental Impact Statement, Wing Creek–Twentymile Timber Sales at 85. Many mammals and birds are partially or totally dependant on old growth habitat. *See id.* at 110. Snags are standing dead trees, and are important habitat for several animal and bird species. *See id.* at 111. Because of the importance of these habitat types, the Nez Perce Forest Plan sets standards for the minimum percentage of forested acres that must be maintained as old growth, and the minimum size and number of snags per acre that must be maintained. *See id.*

actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This requirement serves a dual role: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Stated differently, NEPA's purpose is to ensure that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh,* 490 U.S. at 371, 109 S.Ct. 1851.

 In view of this purpose, an agency that has prepared an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a "hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval." *Id.* at 374, 109 S.Ct. 1851 (citations and quotations omitted). It must "ma[ke] a reasoned decision based on ... the significance—or lack of significance—of the new information," *id.* at 378, 109 S.Ct. 1851, and prepare a supplemental EIS when there are "significant [4] new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). "If there remains major Federal action to occur, and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant

---

4. Regulations promulgated pursuant to NEPA provide:

*Significantly* as used in NEPA requires considerations of both context and intensity: (a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short– and long-term effects are relevant. (b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:
(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.
40 C.F.R. § 1508.27.

extent not already considered, a supplemental EIS must be prepared." *Marsh,* 490 U.S. at 374, 109 S.Ct. 1851 (citations and quotations omitted).

### III

■ FOC contends that the Forest Service violated these NEPA requirements because it failed timely to prepare, or even sufficiently to consider and evaluate the need for, an SEIS in light of the seven new sensitive species designations and its recognition that the old growth and snag standards on which the original Wing Creek–Twentymile EIS relied were inadequate. We agree.

The Forest Service argues that it complied with NEPA because the original EIS documented and the South Fork Assessment reconfirmed that, even after the proposed timber sales, there would be a "surplus" of old growth, exceeding not only the Forest Plan standards, but the revised interim standards as well. Thus, it argues, the revised snag and old growth standards do not constitute *significant* new information about the effects of the proposed timber sales.

The Forest Service makes a similar argument with respect to the seven new sensitive species designations. Regarding those sensitive species that depend on old growth habitat, it argues that the EIS's conclusion that there would be a surplus of old growth left after the proposed sales demonstrates that the sensitive species designations are not significant to the sales. Regarding the remaining sensitive species, the Forest Service observes that the South Fork Assessment describes them as being either totally or partially dependent on early seral habitat—relatively open area, dominated by grasses and forbs—which develops after forest fires. It further notes that the South Fork Assessment contains data that show that because of the success of fire-suppression efforts over the past 100 years, little post-fire, early seral habitat exists in the sale area. Accordingly, the Forest Service argues, those species that prefer or depend on early seral habitat largely are absent from the sale area, and their designation as sensitive therefore is not significant with respect to the sales. In fact, the Forest Service contends, to the extent that the proposed timber sales are accomplished through clear-cutting, the open spaces left by the clear-cuts will approximate the early seral habitat preferred by many of the sensitive species and thus benefit them.

These arguments miss the point. "When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require [an SEIS]." *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir. 1980). The Forest Service failed to do this here. There is no evidence in the record that, before the inception of this action, the Forest Service ever considered whether the seven new sensitive species designations or the inadequacy of the snag and old growth standards upon which the original EIS relied were sufficiently significant to require preparation of an SEIS. When confronted with this important new information, it was incumbent on the Forest Service to evaluate the existing EIS to determine whether it required supplementation. *See Marsh,* 490 U.S. at 374, 109 S.Ct. 1851. Nothing in the record indicates that the Forest Service did so until after FOC sued it, well after it designated the seven new sensitive species and recognized that its old growth and snag standards were inadequate. Although the Forest Service now can point to data that, if timely considered, would have shown that the new information did not require an SEIS, this does not demonstrate that the Forest Service complied with NEPA, which demands timely and reasoned agency action.

■ That the plaintiffs did not specifically identify this new information as the basis for their demands until after they

sued the Forest Service did not excuse the Forest Service from earlier assessing the need for an SEIS. As we have admonished, "Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *City of Davis v. Coleman,* 521 F.2d 661, 667 (9th Cir.1975). It is the agency, not an environmental plaintiff, that has a "continuing duty to gather and evaluate new information relevant to the environmental impact of its actions," even after release of an EIS. *Warm Springs,* 621 F.2d at 1023.

The Forest Service was aware of the sensitive species designations and the inadequacy of the old growth and snag standards before the plaintiffs pointed out that information during this lawsuit. This information was not buried in a report prepared by another agency, which might have escaped the Forest Service's attention, but was generated by the Forest Service itself. *Cf. Marsh,* 490 U.S. at 369, 379, 109 S.Ct. 1851 (noting that the new information at issue in that case was prepared by agencies other than the defendant, and that the defendant first became aware of it during the litigation). The Forest Service recognizes the importance of its designation of species as sensitive, and of its old growth and snag standards, to its mission of maintaining viable populations of animals. *See* notes 2 and 3, *supra.*[5]

NEPA required the Forest Service to make a timely review of whether the new sensitive species designations, or the new standards for old growth and snags, required an SEIS. The Forest Service knew that it had designated several new species as sensitive, and it knew that the Forest Plan's standards for old growth and snags, upon which the original EIS relied, were inadequate. We hold that the Forest Service's failure to evaluate in a timely manner the need to supplement the original EIS in light of that new information violated NEPA.

## IV

■ The question of FOC's request for an injunction remains. The Forest Service points out that since this action commenced, it has prepared an additional SIR and several other analyses that specifically address the significance of the new information at issue. On this basis, it argues that even if it failed adequately to assess the significance of the sensitive species designations and the changed old growth and snag standards before it was sued, it now has done so, and that enjoining the timber sales is unwarranted and serves no legitimate purpose. We agree that no injunction should issue.

## A

■ FOC contends that the supplemental studies do not comply with NEPA be-

---

**5.** In *Swanson v. United States Forest Service,* 87 F.3d 339 (9th Cir.1996), we held that the listing as threatened under the Endangered Species Act of the Snake River chinook salmon did not constitute significant new information requiring the Forest Service to prepare an SEIS with respect to certain timber sales. *Id.* at 344. Seizing upon a phrase in that decision—that the change in status of the chinook from "sensitive" to "threatened" "changed the legal status of the salmon, but ... did not change the biological status," *id.*—the Forest Service argues that its designation of species as sensitive is similarly insignificant. This argument lacks merit, for two reasons. First, as noted above, designation of a species as sensitive is evidence of the Forest Service's recognition that the species'

biological status *has* changed: that its population has declined significantly or is predicted to do so. Second, the Forest Service has taken the statement in *Swanson* out of context. In the very next sentence we explained that the listing of the chinook was not significant because, "The Forest Service previously determined that it was unlikely that the proposed actions would have a negative impact on the salmon; as this finding was not premised on the salmon's non-threatened status, the determination that the salmon were in fact threatened did not constitute new information [that would require preparation of an SEIS]." *Id.* Here, in contrast, before the onset of this action, the Forest Service never considered the effect of the proposed timber sales on the seven species at issue.

cause the Forest Service performed them without public participation or comment. We reject this argument. Although NEPA requires agencies to allow the public to participate in the preparation of an SEIS, there is no such requirement for the decision *whether* to prepare an SEIS. *See California v. Watt,* 683 F.2d 1253, 1268 (9th Cir.1982), *rev'd on other grounds sub nom., Secretary of the Interior v. California,* 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). As we have explained, "the public comment process ... is not essential every time new information comes to light after an EIS is prepared. Were we to hold otherwise, the threshold decision not to supplement an EIS would become as burdensome as preparing the supplemental EIS itself, and the continuing duty to gather and evaluate new information ... could prolong NEPA review beyond reasonable limits." *Id.* (internal citation omitted).

### B

FOC also contends that we cannot consider these supplemental studies because they were not part of the administrative record when, before the onset of this action, the Forest Service sent the plaintiffs letters refusing to prepare an SEIS. We disagree.

▆▆▆ FOC's argument reflects confusion between lawsuits that challenge the propriety of a final agency action, and suits that are brought to compel an agency to act in the first instance. When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In these cases, the agency must justify its final action by reference to the reasons it considered at the time it acted. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106

(1973). An action to compel an agency to prepare an SEIS, however, is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1), to "compel agency action unlawfully withheld or unreasonably delayed." *Oregon Natural Res. Council Action v. United States Forest Service,* 59 F.Supp.2d 1085, 1095 (W.D.Wash.1999). In such cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record. *See Independence Mining Co., Inc. v. Babbitt,* 105 F.3d 502, 511 (9th Cir.1997).

▆▆▆ More significantly, if extra-record evidence shows that an agency has rectified a NEPA violation after the onset of legal proceedings, that evidence is relevant to the question of whether relief should be granted. For example, in *Warm Springs,* we held that the Army Corps of Engineers violated NEPA when it failed properly to evaluate the need for an SEIS in light of new information it had received. 621 F.2d at 1025. The Corps did, however, perform the required analysis after litigation began, as demonstrated by documents submitted to the court in the course of the appeal. *See id.* at 1025–26. We considered those supplemental documents, and determined that there was no reason to remand for an injunction, as the plaintiffs had requested, observing that doing so would be pointless: "The district court could not order the Corps to conduct studies already completed to answer questions the Corps already has answered on a basis that could not be successfully challenged." *Id.; see also Marsh,* 490 U.S. at 368, 379–80, 109 S.Ct. 1851 (where plaintiff identified new information that allegedly triggered need for SEIS only after onset of litigation, agency prepared study during litigation, and Court looked to that study to determine whether agency met NEPA obligations); *Lone Rock Timber Co. v. United States Dep't of Interior,* 842 F.Supp. 433, 438 (D.Or.1994) (in action to compel agency to prepare biological opin-

ion required by the Endangered Species Act, fact that agency prepared opinion after onset of litigation mooted claim for injunctive relief).

Applying these principles here, we conclude that the supplemental material submitted by the Forest Service is properly before us, and must be considered in determining whether FOC is entitled to the injunctive relief it seeks.[6]

### C

Among the documents prepared since the inception of this litigation are a new SIR, several Biological Assessments and Biological Evaluations,[7] and other documents, all of which contain additional data and analyses supporting the Forest Service's conclusion that the seven sensitive species designations and the new old growth and snag standards do not constitute "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" that require an SEIS. 40 C.F.R. § 1502.9(c)(1)(ii). These new analyses support what the Forest Service contended the EIS and South Fork Assessment showed: That, after the sales, old growth and snag standards will be satisfied; that because of the abundance of old growth remaining after the sales, the sales will not significantly affect the sensitive old-growth dependant species that are in the sale area; that the other sensitive species are not found within the sale area because of the absence of their preferred post-fire, early seral habitat; and that clear-cuts generated by the sale may benefit those species by creating open areas not unlike post-fire, early seral habitat.

We conclude that the Forest Service has taken the requisite "hard look" at the newly-designated sensitive species and at the old growth and snag standards, and that its determination that an SEIS is not re-

quired is not arbitrary and capricious. An agency need only articulate a rational connection between the facts it has found and its conclusions. *See United States v. Louisiana–Pacific Corp.,* 967 F.2d 1372, 1376 (9th Cir.1992). The Forest Service has done so here, and even were we to disagree with its conclusion, we could not substitute our judgment for that of the agency. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. As in *Warm Springs,* it would serve no useful purpose to remand this case to the district court for it to order the Forest Service to prepare studies that the Forest Service already has completed and that cannot be successfully challenged.

### CONCLUSION

We hold that the Forest Service should have timely and properly considered the need for an SEIS in light of the new information that the Forest Service itself had developed concerning sensitive species and its old growth and snag standards. Its failure to do so violated NEPA. However, it now has sufficiently and reasonably evaluated the need for an SEIS, and concluded that the new information does not show that the timber sales will significantly affect the quality of the environment in a way not already considered in the NEPA process. This conclusion is not arbitrary or capricious. Therefore, there is no basis, need or justification for entry of an injunction against those sales.

AFFIRMED.

---

6. In view of our conclusion, FOC's motion to strike this supplemental material, and references to it in the Forest Service's briefs, is denied.

7. These are documents used to evaluate the effect of proposed actions on sensitive, threatened, or endangered species. *See* 16 U.S.C. § 1536(c); FSM § 2672.4.