OREGON NATURAL RESOURCES COUNCIL ACTION, an Oregon non-profit corporation; Oregon Natural Resources Council Fund, an Oregon nonprofit corporation; and American Lands Alliance, an Oregon nonprofit corporation, Plaintiffs,

v.

UNITED STATES FOREST SERVICE; Ann Veneman, Secretary, U.S. Department of Agriculture; Richard Ferraro, Deputy Regional Forester, U.S. Forest Service, Defendants,

and

Starfire Lumber Co., Engle Investors, Inc., American Forest Resource Council, Amici Curiae/Defendants–Intervenors.

Civil No. 03–613–KI.

United States District Court,
D. Oregon.

Oct. 9, 2003.

See, also, 59 F.Supp.2d 1085.

Michael D. Axline, Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, for Plaintiff.

John P. Almeida, U.S. Department of Justice, Washington, DC, Owen L. Schmidt, USDA–Office of the General Counsel, Stephen J. Odell, U.S. Attorney's Office, Portland, OR, for Defendants.

Julie A. Weis, Scott W. Horngren, Haglund Kirtley Kelley & Horngren, LLP, Portland, OR, for Intervenor Defendant.

## OPINION

KING, District Judge.

Plaintiffs Oregon Natural Resources Council Action, Oregon Natural Resources Council Fund, and American Lands Alliance (collectively "ONRC") challenge six timber sales, alleging that the Forest Service has failed to comply with the National Environmental Policy Act ("NEPA"). On July 31, 2003, this court granted ONRC's motion for temporary restraining order, enjoining with certain limitations logging on three of the sales, and the parties stipulated to a temporary injunction with respect to the other three sales. ONRC then moved for a preliminary injunction, and ONRC and the Forest Service filed cross motions for summary judgment. Because the resolution of the cross motions for summary judgment is dispositive of the legal issues in this case, ONRC's preliminary injunction motion collapses into the summary judgment determination. For the following reasons, ONRC's motion for summary judgment (# 20) is granted, the Forest Service's motion for summary judgment (# 48) is denied, and ONRC's motion for preliminary injunction (# 29) is deemed moot.

## FACTS

In April 1994, the Secretaries of Agriculture and Interior adopted the Northwest

Forest Plan in part to protect at-risk species in federal forests within the range of the Northern Spotted Owl. The Northwest Forest Plan established "Survey and Manage" requirements for certain species at risk from logging of old growth or late-successional forests covered by the Plan. The Forest Service subsequently adopted internal interpretive memoranda that exempted certain species and timber sales from the survey and manage requirements.

During 1997 and 1998 the Forest Service prepared Environmental Assessments ("EAs") for the six timber sales in the Mt. Hood and Willamette National Forests that are at issue in this case. The Forest Service did not conduct any surveys before preparing these EAs because, consistent with its interpretive memoranda, the Forest Service believed that no surveys were required for any timber sales with decision notices signed before October 1, 1998.

In August 1999, Judge Dwyer in the Western District of Washington held that the interpretive memoranda adopted by the Forest Service illegally exempted certain at-risk species and timber sales from the survey and manage requirements of the Northwest Forest Plan, and illegally changed the protocol for the red tree vole, a source of food for the Northern Spotted Owl. *Oregon Natural Resources Council Action v. United States Forest Service*, 59 F.Supp.2d. 1085, 1092 (W.D.Wash.1999) ("*ONRC Action*"). After Judge Dwyer's decision on the cross motions for summary judgment, the parties settled the relief portion of the case. The parties agreed that before the Forest Service could log certain timber sales, it was required to conduct surveys and manage any locations of species pursuant to the Northwest Forest Plan. The survey results and management actions were to be documented in Supplemental Information Reports ("SIRs") for any sales. The stipulation

entered into by the parties was to remain in effect until the Forest Service amended the survey and manage standard.

In January 2001, the Forest Service issued a Record of Decision ("ROD") and amended the survey and manage standard. The 2001 ROD increased from four to six the number of categories that the species that must be surveyed for, managed for, or both, fall into. In plaintiffs' view, the 2001 ROD moved many species around or altogether out of categories, and in that respect, ultimately eliminated the protections they once had. However, the 2001 ROD still required that the Forest Service survey for and/or manage at-risk species, including species surveyed for and/or managed in the areas relevant to this action.

After it issued the EAs for the six timber sales, the Forest Service conducted certain surveys and issued SIRs to document the survey results and management changes. The Forest Service implemented changes to most of the sales that reduced in acreage the forest to be logged as a part of each sale. Private citizens also conducted surveys. The Forest Service confirmed the results of some of these surveys and made further downward adjustments to the relevant sales based on the addition of buffers for the newly found species.

The Forest Service took the following actions with respect to each sale:

*Clark Timber Sale*

In October 1997, the Forest Service prepared an EA which resulted in a Finding of No Significant Impact ("FONSI") and authorized logging. The adopted alternative provided for logging of 274 acres (15 MBF of timber).

On March 16, 1998, the Forest Service awarded a contract for the timber sale. At some point in the interim, the Forest Service had changed the total number of acres to be logged from 274 to 94 acres.

Between March 2000 and January 2001, the Forest Service conducted surveys for the red tree vole. Surveys revealed 26 active and 17 inactive red tree vole nests. The Forest Service established habitat areas around the active nests which could no longer be logged, reducing the Clark Timber Sale from 94 to 43 acres, as documented in its September 2001 SIR. Private citizens conducted their own surveys which found an additional 9 active and seven inactive sites. The Forest Service established habitat areas around additional nests, which further reduced the area to be logged from 43 to 29 acres, as documented in its January 2002 SIR.

### Solo/Lone Timber Sale

In September 1998, the Forest Service prepared an EA which resulted in a FONSI and authorized logging. The adopted alternative provided for the logging of 216 acres.

After it issued the EA, the Forest Service conducted red tree vole surveys but none were found. The Forest Service also conducted surveys that showed the presence of the Malone jumping slug, and Lysogyrus, an aquatic mollusk, both of which were then listed as a Survey and Manage Species. The Forest Service's August 23, 2001 SIR reflects the presence of these species.

The Forest Service reduced the sale from 125 acres to 55 acres after establishing habitat (at some point in the interim the sale had first been reduced from 216 acres to 125 acres). Subsequently, private citizens conducted surveys that showed the presence of a protected species of lichen. The Forest Service issued a second SIR on June 23, 2002, confirming the results of the citizen surveys and further reducing the area to be logged by creating a less than one acre buffer around the lichens. Also in June 2002, the Malone jumping slug was removed from the list of Survey and Manage Species, and the Forest Service re-

stored some but not all units of the sale back to their original size.

On March 4, 2003, the Forest Service awarded a contract for the timber sale, allowing logging on 167 acres.

### Borg Timber Sale

In September 1998, the Forest Service prepared an EA which resulted in a FONSI and authorized logging. The adopted alternative provided for the logging of 45 acres.

In the spring of 2000, the Forest Service performed certain surveys. On January 7, 2002, the Forest Service issued an SIR. The SIR stated that the amount of forest to be logged was 67 acres (greater than what was listed in the EA) and indicated that two protected species of lichen, the Malone jumping slug and two species of protected fungus were present. No red tree voles were found. The Forest Service modified the area to be logged from 67 to 63 acres and a different road was designated for yarding near the fungi.

On August 12, 2002, the Forest Service awarded the Borg Timber Sale contract, allowing 60 acres to be logged.

On July 8, 1998 the U.S. Fish and Wildlife Service proposed the Canada Lynx for listing as "threatened" under the ESA. On September 1, 1998, the Forest Service prepared a Biological Evaluation ("BE") as part of the EA for the Borg timber sale, which stated that no suitable habitat for lynx existed in the sale area and concluded that logging would have "no effect to lynx habitat." On February 19, 1999, the Forest Service issued an amendment to the BE, acknowledging that denning and travel habitat for the lynx does exist within the Borg sale area. On March 24, 2000, FWS listed lynx as a threatened species under the ESA. The 2002 SIR for the Borg timber sale does not mention the listing of the

lynx or the impacts of logging on the lynx or its habitat within the sale area.

*Straw Devil Timber Sale and East Devil Timber Sale*

In June 1998, the Forest Service prepared an EA for the Straw Devil and East Devil sales which resulted in a FONSI and authorized logging.

After issuing the EA, the Forest Service conducted surveys, the results of which were published in an SIR on July 23, 2001. The surveys found red tree voles and fungi. Based on the presence of these species, Straw Devil was reduced from 148 to 84 acres, and East Devil was reduced from 157 acres to 109 acres. From June through August 2002, private citizens gave the Forest Service further information from their own surveys, which the Forest Service used to reduce the size of Straw Devil by approximately 24 acres.

The East Devil contract was awarded on January 10, 2002, and the Straw Devil was awarded on March 5, 2002.

*Pryor Timber Sale*

In March 1998, the Forest Service prepared an EA which resulted in a FONSI and authorized logging. The adopted alternative provided for 11.2 MBF of timber, logging 72 acres of old growth stands.

During 2000, the Forest Service conducted surveys for the red tree voles, mollusks, and plants including lichens. The surveys revealed 13 active red tree vole nests and 16 inactive nests, and the timber sale boundaries were changed to protect these nests. The Forest Service states that the plant and mollusk surveys did not result in any changes because the species that were found were removed from the Survey and Manage list in the 2001 ROD. The timber sale was reduced from 139 acres to 90 acres, as reflected in the December 19, 2001 SIR.

Since the Forest Service prepared EAs for these six sales in 1997 and 1998, the agency has not prepared new or supplemental NEPA analyses to consider, analyze or disclose its duties under the survey and manage standard, the results of the surveys, or any changes made to the sales.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

■ The purpose of NEPA is to foster better decision making and informed public participation for actions that affect the environment. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c). NEPA requires federal agencies to involve the public, consider alternatives, and disclose the impacts of a proposed action and alternatives to it before making a decision. 42 U.S.C. § 4332(2)(C). This requirement ensures that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implemen-

tation of that decision." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir.2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). NEPA does not guarantee substantive results but only sets forth procedural mechanisms to ensure proper consideration of environmental concerns. *Carmel-by-the-Sea v. United States Department of Transportation*, 123 F.3d 1142, 1150 (9th Cir.1997).

NEPA regulations require an agency to consider whether an action falls within a class of actions that normally require an Environmental Impact Statement ("EIS"), or whether an action falls within a class of actions requiring no environmental evaluation ("Categorical Exclusion"). 40 C.F.R. § 1501.4(a). If a proposed action is neither a categorical exclusion nor the type normally requiring an EIS, then the agency is directed to prepare an EA to determine whether to prepare an EIS. 40 C.F.R. § 1501.4(a)-(c).

An EIS is not required for every action. NEPA only directs federal agencies to prepare an EIS for proposed "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The preparation of an EA will either lead to a finding that an EIS must be prepared because of potentially significant environmental impacts resulting from the proposed action, or to a Finding of No Significant Impact ("FONSI"), which means that an EIS is not required. 40 C.F.R. § § 1501.4(c)-(e), 1508.13.

■ Agencies are required to prepare supplements to an EIS if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). The regulations do not address an agency's obligation to supplement an EA, but Ninth Circuit case law holds that supplementa-

tion of an EA may be required when, like with the standard for supplementing an EIS, there have been significant changes in the proposed action. *See, e.g., Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir.1998).

ONRC challenges the six timber sales by bringing three claims under NEPA. Claim one alleges that the Forest Service violated NEPA by failing to involve the public, to consider alternatives, and to disclose the impacts of logging, because it did not prepare a new or supplemental NEPA analysis that considers the Forest Service's survey and manage duties, the results of the surveys, or the management decisions based on them.

Claim two alleges essentially the same failure on the part of the Forest Service, but it is pleaded in the alternative. Claim two alleges that the Forest Service violated NEPA because the survey and manage standard, survey results, and changes to the timber sales constitute changed circumstances and "significant new information" that requires the Forest Service to prepare a supplemental NEPA analysis.

Claim three also alleges that the Forest Service failed to act on significant new information. This claim applies to the Borg and East Devil timber sales only. Plaintiffs allege that the Forest Service violated NEPA by not preparing supplemental NEPA analyses for these sales for the additional reason that the presence of lynx habitat in the forests within these sales is significant new information.

I. *ONRC's First Claim for Relief*

In ONRC's first claim, it argues that the Forest Service conducted the EAs at issue in this case under interpretive memoranda that were subsequently held to be illegal with respect to the agency's survey and manage duties. ONRC argues that the survey and manage duties and the results

of the implementation of those duties were required to be in a NEPA analysis and because the Forest Service has never done so, it has violated NEPA. According to ONRC, this failure means that the Forest Service has never considered a project analysis that properly frames the agency's survey and manage duties as a predicate to allowing any logging, it has not prepared an analysis that considers a range of alternatives based upon that predicate, and it has not prepared an analysis that properly evaluates the surveys done. By not doing these things within the NEPA context, ONRC argues the Forest Service has not ensured that it had all of the proper information before it before allowing logging, and the Forest Service has prevented the public from being fully informed and allowed to influence the process.

In this context, ONRC argues that the use of SIRs does not satisfy the Forest Service's NEPA obligations. ONRC argues that because the SIRs were issued years after the EAs, they could not and did not inform the agency's decisions in authorizing the timber sales. Additionally, the SIRs issued by the Forest Service were not a part of a reopened decision making process and were not subject to appeal.

ONRC relies on *Idaho Sporting Congress v. Alexander*, 222 F.3d 562 (9th Cir. 2000), which held that SIRs prepared years after the original decisions to approve timber sales did not satisfy NEPA. The Ninth Circuit's analysis here is highly relevant and I will examine the case in detail.

In *Idaho Sporting Congress*, the Forest Service had prepared NEPA analyses for five timber sales that did not comply with the National Forest Management Act ("NFMA") or the Forest Plan. *Id.* at 564. After the EAs and EISs for the sales at issue in the case had been completed, the Ninth Circuit issued its opinion in *Neigh-*

*bors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372 (9th Cir. 1998). In *Cuddy Mountain*, the Ninth Circuit found that the EIS at issue in that case was inadequate under NFMA because it failed to show that the proposed logging would not reduce old growth habitat below the levels that had been previously determined as necessary to sustain certain species, it failed to evaluate adequately the cumulative effects of three nearby timber sales, and it failed to take a "hard look" at mitigation measures. *Id.* at 1377–81.

Following the Ninth Circuit's decision in *Cuddy Mountain*, the *Idaho Sporting Congress* plaintiffs filed two lawsuits. In the first lawsuit, the plaintiffs sought to enjoin nine timber sales on the basis that the Forest Service had failed to comply with NFMA and NEPA in preparing the EAs and EISs for the sales. The district court denied the plaintiffs' motion for preliminary injunction, which was affirmed by the Ninth Circuit on appeal. *Idaho Sporting Congress v. Alexander*, 173 F.3d 860 (9th Cir.1999) ("*Idaho Sporting Congress I*"). The parties subsequently settled the case. The settlement provided that the lawsuit would be dismissed without prejudice and the Forest Service would "complete additional environmental documentation" of the timber sales "in the form of supplemental information reports (SIRs) that will examine whether further environmental review and documentation is required." *Idaho Sporting Congress*, 222 F.3d at 564 (quoting *Idaho Sporting Congress I* settlement agreement).

The Forest Service's completion of the SIRs pursuant to the settlement agreement in *Idaho Sporting Congress I* gave rise to the second *Idaho Sporting Congress* case. For each of the sales at issue, the Forest Service issued SIRs that found that the original EA or EIS "adequately displayed the effects of the Selected Alter-

native on the environment" and that "[n]othing in the new information demonstrates that the project will affect the quality of the human environment in a significant manner or significant extent not already considered in the underlying [NEPA] documents." *Id.* The SIRs concluded that there is no "need to correct, supplement, or revise the environmental document or the [Forest Service's] decision." *Id.* The plaintiffs filed a second lawsuit, alleging violations of NEPA and NFMA. The district court denied the plaintiffs' motion for temporary restraining order, motion for reconsideration and motion for preliminary injunction.

The plaintiffs appealed to the Ninth Circuit, which reversed the district court. On appeal, the plaintiffs argued that the EAs and EISs for the timber sales at issue in the case were deficient as a matter of law under the Ninth Circuit's decision in *Cuddy Mountain* and that the Forest Service cannot use SIRs to correct the deficiencies. The Ninth Circuit agreed:

> To this end, we have held that EAs and EISs must be prepared early enough so that [they] can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made. The phrase "early enough" means at the earliest possible time to insure that planning and decisions reflect environmental values. The SIRs at issue in this case do not satisfy these timing requirements. The Forest Service did not compile the information and analysis presented in the SIRs at the earliest possible time. The record indicates that the SIRs were prepared in response to litigation, years after the original decisions to approve the timber sales were made. Furthermore, although the public was given an opportunity to comment on the SIRs, the Forest Service's decisionmaking process was not formally reopened and no adminis-

trative appeal of the SIRs was permitted. The SIRs therefore do not remedy the fact that at the time the Forest Service originally approved the timber sales, it did not have available all the information and analysis our decision in *Cuddy Mountain* says it was required to consider.

*Id.* at 567–68 (internal citations and quotations omitted).

The factual background and procedural posture of *Idaho Sporting Congress* were almost identical to ONRC's challenge in this case. The Forest Service attempts to distinguish *Idaho Sporting Congress* in two main ways. The Forest Service contends that *Idaho Sporting Congress* is distinguishable because the plaintiffs in that case were alleging that the SIRs could not be used to supplement *an originally deficient EA*. The bottom line in that case, according to the Forest Service, was that the plaintiffs argued that the original NEPA documents were deficient for never having examined a certain issue that the Forest Service had before it at the time. Here, the Forest Service points out that ONRC in certain points in its briefing and at oral argument specifically stated that it does not challenge the adequacy of the EAs, but instead challenges the failure to prepare new EAs. Related to this argument, the Forest Service contends that this case is different than *Idaho Sporting Congress* because in this case, the EAs have never been *held* to be deficient as a matter of law.

The Forest Service instead characterizes the issue in this case as dealing with the new information the agency has learned— some information resulting from the surveys that were conducted after Judge Dwyer's ruling in *ONRC Action,* and some learned following the adoption of the new survey and manage requirements of the 2001 ROD. ONRC does indeed make argu-

ments in the context of the information being "new and significant," but this relates only to its second and third claims for relief, which are pleaded in the alternative to claim one. Presumably the Forest Service wants this court to find that the only proper claims before it are for failure to supplement the NEPA documents based on significant new information because the result would be a deferential review of the Forest Service's decision in each SIR that the results of the surveys were not significant. However, with respect to ONRC's first claim, I find that the Forest Service has not sufficiently distinguished this case from the Ninth Circuit's decision in *Idaho Sporting Congress*, and I am bound to follow that decision.

■ I agree with the Forest Service that ONRC's position as to whether it is in fact challenging the underlying EAs in this case is somewhat confusing. As noted above, ONRC has specifically stated that it does not challenge the underlying EAs. However, at one point in its responsive memorandum, ONRC states "[b]ecause the Forest Service's survey and manage duties existed before it issued the EAs, the legal requirements of the survey and manage standard are not 'new' information. As a result, they are required to be in a NEPA analysis for the timber sales." Plaintiffs' Combined Mem. at 10. In its most recent submission, ONRC contends that even if this court determines that a "challenge" to the underlying EAs is a factual predicate for the court to reach the issues raised by claim one, then ONRC has sufficiently alleged that the EAs are legally deficient. ONRC points to several sections of its Complaint in which it makes such allegations. Although the importance of whether this is or is not a "challenge" to the underlying EAs is still unclear, what is clear is that in order for *Idaho Sporting Congress* to control, I must determine that the underlying EAs are legally deficient.

As discussed further below, I agree with ONRC that the EAs are deficient.

On this point, in trying to distinguish *Idaho Sporting Congress*, the Forest Service appears to put a lot of weight on the fact that the EAs at issue in this case have not been held to be deficient. The Forest Service argues that although Judge Dwyer in *ONRC Action* made the broad declaratory judgment that "[t]he defendants' administrative actions to authorize timber sales on the basis of memoranda that would vitiate the survey requirements are declared to be unlawful," *ONRC Action*, 59 F.Supp.2d. at 1097, his ruling was based solely on NFMA, not NEPA, and he did not explicitly refer to the EAs at issue in this case.

I find this argument unavailing for two reasons. First, the Forest Service made the same argument in *Idaho Sporting Congress* that "no court has ever held the NEPA documents to be inadequate." *See* Brief for Federal Appellees, *Idaho Sporting Congress v. Alexander*, 1999 WL 33607428, at *19 n. 5 (9th Cir.1999) (No. 99–35847). The Ninth Circuit implicitly rejected this argument, finding that the original EAs did not meet the requirements of NEPA, NFMA and the Forest Service's own Land Resource Management Plan. *Idaho Sporting Congress*, 222 F.3d at 567. Although the Forest Service contends it is important that no court has specifically declared the EAs for the six timber sales in this case to be invalid, I find it significant that the Forest Service never affirmatively argues that any EA considers, analyzes or discloses the legal requirements of the survey and manage duties or the information based on those duties. In other words, the Forest Service does not actually contend the underlying EAs in this case meet the legal requirements.

Second, the Forest Service is on shaky ground in arguing that the reach of Judge Dwyer's decision was extremely narrow. Approximately one week after Judge Dwyer issued the declaratory judgment, the Forest Service committed to producing a list of all timber sales that had been issued under the interpretive memoranda Judge Dwyer held to be illegal. The Forest Service, not ONRC, came forward with a list, which includes the six timber sales at issue in this case. In any event, I do not believe that I am specifically bound by Judge Dwyer's decision, and only note that his ruling and the Forest Service's subsequent admissions weaken the agency's position in this case.

In *Idaho Sporting Congress*, the Ninth Circuit specifically held that the requirements at issue in that case were not "new." *Idaho Sporting Congress*, 222 F.3d at 567. The Ninth Circuit noted that "[a]lthough *Cuddy Mountain* may have been decided after the Forest Service prepared its original EAs and EISs for the timber sales at issue in this case, our decision did not create these requirements. They stem from NEPA, NFMA and the Forest Service's own [Land Resource Management Plan]. The Forest Service knew or should have known that it needed to provide this information and analysis at the time it prepared the original EAs and EISs." *Id.* The same is true in this case. Although they have been amended, the survey and manage requirements at issue in this case are not "new," nor did they "arise" from Judge Dwyer's decision in *ONRC Action*.

It is undisputed that the Forest Service has never issued NEPA documents for these timber sales that disclose or analyze its survey and manage duties or the results of the surveys. As Judge Dwyer noted in *ONRC Action*, "[t]he surveys are designed to identify and locate species; if they are not done before logging starts, plants and animals listed in the ROD will face a potentially fatal loss of protection." *ONRC Action*, 59 F.Supp.2d at 1093. Several Forest Service documents show that the Forest Service itself has recognized that the presence or absence of survey and manage species is information that should be available prior to the issuance of a NEPA document and should be used for formulating a range of alternatives, evaluating effects, and decision making. *See* Plaintiffs' Exhibit C and Plaintiffs' Supplemental Exhibit A.

■ NEPA requires federal agencies to involve the public, consider alternatives, and disclose the impacts of a proposed action and alternatives to it before making a decision. 42 U.S.C. § 4332(2)(C). This ensures that the agency will carefully consider detailed information before it makes decisions and that the public may play a role in both the decision making process and implementation of the decisions. *Friends of the Clearwater*, 222 F.3d at 557. The underlying EAs for the timber sales at issue did not properly frame the Forest Service's survey and manage duties, they did not analyze a range of alternatives based upon these duties, they did not evaluate completed surveys, they did not demonstrate that the Forest Service had all of the proper information before it before allowing logging, and they did not provide for public influence over the decisions. For all of these reasons, the underlying EAs are legally deficient. Under *Idaho Sporting Congress*, "[i]t is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS, to correct this type of lapse." *Id.* I find that the Forest Service's use of SIRs in this case violates NEPA.

II. *Preclusion*

■ The Forest Service argues that ONRC is precluded from bringing this challenge under the doctrine of res judica-

ta. In *American Lands Alliance v. Kenops,* CV 99–80–KI, this court upheld the Forest Service's FONSIs with respect to the Straw Devil, East Devil and Pryor sales. The Forest Service argues that plaintiffs should have raised their survey and manage challenges in that lawsuit. ONRC argues that, among other reasons, it is not barred by res judicata because the parties to this case are not the same as in the *Kenops* case. Although one plaintiff, American Lands Alliance, was a plaintiff in both cases, ONRC Action and ONRC Fund were not parties to the *Kenops* case. I find that the Forest Service has not carried its burden of showing that the environmental groups' interests were exactly aligned and therefore the parties to *Kenops* are "virtual representatives" of the parties to this action.

■ As an extension of its preclusion arguments, the Forest Service also argues that if plaintiffs were going to challenge the adequacy of any of the project decisions based on the survey and manage requirements, they are bound by their stipulation in *ONRC Action* to raise those challenges in the context of that litigation. ONRC argues, and I agree, that its stipulation in *ONRC Action* does not bar the present suit. First, although ONRC did stipulate to the preparation of SIRs, nothing in the stipulation indicates that those SIRs would be completed *in lieu of* further NEPA documentation. Additionally, the terms of the stipulation provided that it would expire upon the completion of the Forest Service's amendments to the survey and manage standards. Because the Forest Service did not complete the survey and manage amendments until 2001 and did not complete the required surveys during this time period, plaintiffs were unable to re-open the action in front of Judge Dwyer within the timeframe provided for in the stipulation. For these reasons, I find that ONRC is not precluded from bringing the current challenge.

Because I find that the Forest Service has violated NEPA in not preparing NEPA documents disclosing or analyzing its survey and manage duties, the results of surveys, and management decisions based on the results, I grant ONRC's motion for summary judgment as to claim one, and I do not reach ONRC's remaining alternative claims.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment (# 20) is granted, defendant's motion for summary judgment is denied (# 48), and plaintiffs' motion for preliminary injunction (# 29) is deemed moot. The parties' stipulated injunction approved by the court on September 30, 2003, as to the Clark, Solo/Lone, and Borg timber sales, and the court's July 31, 2003, order as to the Pryor, East Devil, and Straw Devil timber sales are extended until the court makes a further determination as to the appropriateness of injunctive relief in this case.