CONSERVATION CONGRESS,
Plaintiff,

v.

UNITED STATES FOREST SERVICE,
United States Fish and Wildlife
Service, Defendants,

and

Trinity River Lumber Company,
Defendant Intervenor.

No. 2:13–cv–01977–JAM–DB

United States District Court,
E.D. California.

Signed February 16, 2017

Filed February 17, 2017

Stuart N. Wilcox, PHV, Stuart N. Wilcox, Attorney at Law, Pro Hac Vice, Denver, CO, Steven Sugarman, PHV, Law Office of Steven Sugarman, Pro Hac Vice, James Jay Tutchton, Tutchton Law Office Environmental Law Clinic, Centennial, CO, for Plaintiff.

Paul David Barker, Jr., Andrea Gelatt, Govt, Trent S.W. Crable, Tyler Burgess, Govt, United States Department of Justice, Washington, DC, for Defendants.

Dennis L. Porter, Law Offices of Dennis L. Porter, Sacramento, CA, Lawson E. Fite, PHV, Pro Hac Vice, Scott W. Horngren, PHV, American Forest Resource Council, Pro Hac Vice, Portland, OR, for Intervenor Defendant.

**ORDER RE PLAINTIFF'S MOTION AND DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

JOHN A. MENDEZ, UNITED STATES DISTRICT JUDGE

And yesterday the bird of night did sit
Even at noon-day upon the marketplace
Hooting and shrieking.

—William Shakespeare, Julius Caesar, act 1, sc. 2.

This litigation concerns the continuing viability of the revered Northern spotted owl ("NSO") and whether it may soon portend its own demise at the hands of its protector, the federal government. The United States Forest Service ("USFS") plans to execute the Smokey Project ("Project"), a proposal to administer fuel and vegetative treatments intended to further habitat and fire management goals in the Mendocino National Forest ("MNF") and contribute to the MNF's timber production goals. The USFS engaged with interested parties as it developed the Project, leading to its decision to adopt the proposal. Conservation Congress ("Plaintiff") participated throughout that process, advocating for the NSO and its old-growth habitat. It now challenges the USFS's final decisions, as well as the Fish and Wildlife Service's ("FWS"; collectively "Defendants") contributions to the end result. As described below, the Court agrees that the USFS failed to meet some of its statutory obligations.

## I. FACTUAL BACKGROUND

The USFS began scoping for the Smokey Project ("Project") in December 2009. See FS–3643. Plaintiff submitted its first set of comments the following March and continued communicating with the USFS over the next year. USFS Administrative Record ("FS")–3627, 3599–3626, FS–3585. In July 2010, the USFS released the Draft Environmental Assessment and opened the 30–day Objection Period. FS–1727, 1645. The Administrative Record indicates that the USFS and Plaintiff had a conference call concerning the project, followed by Plaintiff's submission of its first written Objections in August, which were followed by an in person Objection Resolution meeting. FS–1636, 1557, 1546.

The USFS also consulted with the FWS about the Project's impacts on endangered and threatened species. From Fall 2009 to early 2011, the agencies conferred over whether or not the Project would adversely affect the NSO. See Fish and Wildlife

Service Administrative Record ("FWS")–1–107; FS–18874–94. This determination dictates whether a formal—and more extensive—consultation between the agencies is required pursuant to the Endangered Species Act. See infra Part III.D. The FWS concluded that the Project "may affect, [and is] likely to adversely affect" the NSO (a "MALAA" determination), FWS–1162–64, while the USFS maintained that a "may affect, not likely to adversely affect" determination—which would not require formal consultation—was appropriate for the Project, FS–18882–86; 50 C.F.R. § 402.14. Due to this disagreement, the agencies elevated the Project to a Level 2 team for review. FWS–87. The USFS prepared and submitted a Final Biological Assessment ("BA") for the FWS to review and requested formal consultation on July 5, 2011. FS–18680, 18872; 50 C.F.R. § 402.14(c)(5). By the time the USFS sent over the BA, the agency had also concluded that an MALAA finding for the NSO was appropriate due to the Project's potential impact on prey species. FS–18872.

While the Project was still under review, field examinations revealed a root disease infection that required Project modification. FS–18857. The USFS decided to apply borax to tree stumps in order to prevent the spread of the disease. FS–3580. The agency reopened scoping for the Project in February 2012 to address three substantive changes to the Project, including the use of borax and the change in the USFS's determination that the Project warranted a MALAA finding. FS–3580. Plaintiff submitted its second set of scoping comments at the end of February, which "incorporate[d] by reference [its] original comments as well as [its] original Objection comments (attached)." FS–3545.

The FWS transmitted its Biological Opinion ("BiOp") to the USFS on March 15, 2012. FS–18680. The BiOp concludes that the Project is not likely to jeopardize the continued existence of the NSO rangewide or within the recovery unit. FS–18787. It based this conclusion on the fact that no NSO habitat loss was expected and habitat functionality would be maintained. FS–18788. The expected impacts—degradation of some habitat and harassment/mortality in two home ranges—were expected to be short term, returning back to normal within two to three years post-implementation. FS–18788. It also concluded that the Project is not likely to result in adverse modification of the NSO critical habitat, and that habitat degradation was not expected to impede the recovery function of critical habitat rangewide or within the province. FS–18788–89. An Incidental Take Statement ("ITS") accompanied the BiOp. The ITS, under "Terms and Conditions," imposed a Limited Operating Period ("LOP") from February 1st to September 15th in certain units in accordance with recent, protocol-level survey results. FS–18792. This LOP supplemented the conservation measures already pleaded in the BA, which the USFS must implement. FS–18696. Additionally, the ITS imposes "Monitoring Requirements" that require the agency to document the progress of the action and its effects on the NSO to the FWS in the form of annual monitoring reports containing a minimum of the following information: "progress/status of the proposed project, amount and type of habitat removed or modified, northern spotted owl survey results, and any changes to project implementation not discussed in the biological assessment." FS–18792–93.

The USFS sent out copies of the Draft Final EA and Appendices mid–June 2012 and opened up the second 30–day Objection Period. FS–1365–1436. Plaintiff submitted additional objections. FS–1346, 1291. On August 29th and 30th the USFS published the Final Environmental Assess-

ment and the Decision Notice. FS–10, 19. In its final form, the Project will treat approximately 6400 acres and will include fuel treatments through implementation of Strategically Placed Land Area Treatments across the landscape, timber harvest in matrix lands, and improvement of plantations, meadows, hardwood and late successional habitat. FS–21, 23. The Decision Notice concluded that the Project's actions will not have a significant effect on the quality of the human environment, thus the agency would not be preparing an environmental impact statement. FS–12. The Forest Supervisor decided to implement the proposed Project, which incorporates the terms and conditions of the ITS. FS–11.

On December 4, 2012, the FWS published a final, revised rule designating critical habitat for the NSO ("2012 Critical Habitat Rule"). FS–19091. Because the rule affected most of the Project, USFS issued a Supplemental Biological Assessment. The Supplemental BA concluded that the new finding with respect to NSO critical habitat is MALAA due to short-term adverse effects to NSO nesting/roosting and foraging habitat. FS–19089, 19139. The USFS reinitiated consultation with the FWS on that basis. FS–19089. In the resulting 2014 BiOp, the FWS concluded that the Project is not likely to jeopardize the NSO nor adversely modify or destroy its designated critical habitat. FS–18996.

The USFS reinitiated consultation yet again, in January 2015, after surveyors discovered NSOs in a new location in the Project area. FS–19387. This led to the designation of two new activity centers. FS–19348. The agency sent the FWS its Second Supplemental BA at the end of May 2015 and the FWS issued its BiOp, with the same jeopardy and adverse modification determination, on July 24, 2015. FS–19243–79. On November 30, 2015, the USFS published a Supplemental Information Report, summarizing the agency's "analysis supporting [its] determination that there is no need for supplemental NEPA analysis arising from the new circumstances and information related to the Project." FS–1.

While consultation on the Project was ongoing, the FWS published the Revised Recovery Plan for the Northern Spotted Owl ("2011 RRP"). FS–4230. "Recovery plans describe reasonable actions and criteria that are considered necessary to recover listed species." FS–4231. The 2011 RRP came out June 28, 2011—one day after USFS biologists signed off on the Project's BA—and replaced the 2008 version of the plan. FS–4231. The 2011 RRP is frequently referenced in agency documents and is central to some of Plaintiff's claims.

## II. PROCEDURAL BACKGROUND

Plaintiff filed its Complaint against the USFS and FWS over the Project on September 23, 2013, alleging violations of the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), and the Administrative Procedure Act ("APA"). ECF No. 1. The case was twice stayed as the USFS reinitiated consultation with the FWS at the end of 2013 and again in 2015. ECF Nos. 15 & 53. The second stay terminated with the completion of consultation in July 2015 and Plaintiff filed its Second Amended Complaint, the operative complaint in this case, that October. ECF Nos. 57 & 65. In February 2015, Trinity River Lumber Company ("Intervenor") moved to intervene as a defendant-intervenor in this case, which the Court allowed after the second stay lifted. ECF Nos. 28 & 63. Intervenor is a family owned business that purchased the Smokey Stewardship Project in order to

harvest the Project trees and process the logs into lumber through its local mill. See Declaration of Dee Sanders, ECF No. 30. With the Court's leave, Plaintiff filed a Supplemental Complaint on July 26, 2016, based on the Supplemental Information Report that issued after Plaintiff had filed the Second Amended Complaint. ECF Nos. 100, 101, & 102.

The parties filed their Motion and Cross–Motions for Summary Judgment in July and September of 2016, respectively. ECF Nos. 103, 106, & 109. In support of its motion, Plaintiff submitted a Declaration by Tonja Chi, which Defendants moved to strike. ECF No. 103–4 & 107. Due to Plaintiff's prior representation that it would not request the Court to consider extra–record declarations in the case, the Court granted Defendants' motion to strike the declaration. ECF No. 118. Additionally, the Court granted Defendants' unopposed motion to strike paragraphs 11 and 12 from Denise Boggs' Declaration and paragraph 10 from Ellen Drell's Declaration. Id.

The Court held a hearing on the Motion and Cross–Motions for Summary Judgment on February 2, 2017. The Court took the matter under submission and ordered further briefing on the question of remedies. ECF No. 120.

## III. OPINION

### A. Standard of Review

 Because Plaintiff's claims arise under Acts that do not provide a separate standard for review, the claims are reviewed under the standards of the APA. See San Luis & Delta–Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014). A court does not employ the usual summary judgment standard in this context because, rather than resolving facts, the court is to determine whether or not "the evidence in the administrative record permitted the agency to make the decision it did." Ctr. for Sierra Nevada Conservation v. U.S. Forest Service, 832 F.Supp.2d 1138, 1148 (E.D. Cal. 2011). Thus, this Court will uphold an agency's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Jewell, 747 F.3d at 601; 5 U.S.C. § 706(2). "Although [the Court's] inquiry must be thorough, the standard of review is highly deferential." Id. (citations and quotation marks omitted).

### B. Standing

 Defendants and Intervenor do not challenge Plaintiff's standing to pursue its claims. Plaintiff submitted declarations from three of its members, including Executive Director Denise Boggs, in order to establish standing. Declaration of Denise Boggs ("Boggs Decl."), ECF No. 103–1; Declaration of Douglas Bevington ("Bevington Decl."), ECF No. 103–2; Declaration of Ellen Drell ("Drell Decl."), ECF No. 103–3. Each declarant states that they visit the relevant area of the Mendocino National Forest for recreational purposes, including looking for NSOs. Boggs Decl. at ¶¶ 4–6, 9; Bevington Decl. at ¶¶ 2, 6, 7; Drell Decl. at ¶¶ 2, 3, 5. Each declarant has general and specific plans to visit the area in the future. Boggs Decl. at ¶ 8; Bevington Decl. at ¶ 2; Drell Decl. at ¶ 6. Each is concerned that the Project will harm the forest and the NSO and relies on Plaintiff to litigate those interests on their behalf. Boggs Decl., passim; Bevington Decl. at ¶¶ 5–8; Drell Decl. at ¶ 7–8. The Court finds these facts sufficient to give Plaintiff standing. See Conservation Cong. v. U. S. Forest Service, No. 2:15-00249, 2016 WL 727272, at *2 (E.D. Cal. Feb. 24, 2016) (finding that Conservation Congress had standing); Cottonwood Envtl. Law Ctr. v. U.S. Forest Service, 789 F.3d 1075,

1079–80 (9th Cir. 2015) (describing the standard).

### C. NEPA Claims

■ The National Environmental Policy Act is our basic national charter for protection of the environment. 40 C.F.R. § 1500.1. NEPA "has twin aims. First, it places upon a federal agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002) (internal quotation marks and citations omitted). NEPA does not impose substantive environmental obligations; "[r]ather, it establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." Id.

Under NEPA, federal agencies must provide a detailed environmental impact statement ("EIS") for every major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332; 40 C.F.R. § 1508.11. An agency contemplating such an action may first prepare an environmental assessment ("EA") in order to determine whether an EIS is necessary. 40 C.F.R. § 1508.9; Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998). Should an agency determine that an EIS is unwarranted, it will issue a Decision Notice and Finding of No Significant Impact ("DN/FONSI") that provides "a convincing statement of reasons" to explain why the action will not have a significant effect on the human environment. See Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir. 1988); 40 C.F.R. § 1508.13.

The Healthy Forest Restoration Act ("HFRA"), passed in 2003, modifies an agency's NEPA obligations for qualifying projects. The purposes of the HFRA include, *inter alia,* reducing wildfire risks, enhancing efforts to protect watersheds and address threats to forest and rangeland health, and protecting, restoring, and enhancing forest ecosystem components to promote the recovery of threatened and endangered species. 16 U.S.C. § 6501. An authorized hazardous fuel reduction project may be implemented under the HFRA on federal land if the land contains threatened or endangered species habitat where "natural fire regimes on that land are identified as being important for, or wildfire is identified as a threat to" a threatened species, the project will provide enhanced protection from catastrophic wildfire for the species or its habitat, and the project complies with any applicable guidelines specified in any management or recovery plan for the species. 16 U.S.C. § 6512(a). Except as provided in the HFRA, authorized projects must still comply with NEPA. 16 U.S.C. § 6514. An EA or EIS is required for every such project. 16 U.S.C. § 6514. The HFRA expedites the administrative review process and limits the range of project alternatives that must be considered in detail. 16 U.S.C. §§ 6514(c), 6515; 36 C.F.R. §§ 218.1–218.16.

The USFS considers the Project an HFRA authorized hazardous fuels reduction project and Plaintiff does not challenge that designation in this litigation. The USFS explained that the Project qualifies under the HFRA because the Project is located in a Late Successional Reserve ("LSR") that provides habitat for the NSO, includes portions of NSO critical habitat, and is classified as Fire Regime Condition Class 3, which indicates severe departure from historic conditions and significant chance for the loss of species or habitats. FS–23.

Plaintiff argues that the USFS violated NEPA by: (1) failing to prepare an EIS; (2) failing to adequately assess cumulative impacts; (3) failing to evaluate alternatives; (4) failing to take a hard look at the Project's impacts; and (5) failing to prepare a supplemental EA or EIS. See Plaintiff's Motion for Summary Judgment ("P. MSJ"), ECF No. 103. The Court will consider each of these claims in turn, noting that several of Plaintiff's arguments apply to more than one claim.

### 1. Failure to Prepare an Environmental Impact Statement

■■■■ "An EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.'" Blue Mountains Biodiversity Project, 161 F.3d at 1212 (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998)). Plaintiff may prevail on its claim that the USFS violated its statutory duty by raising these questions and is not required to show that the significant effects will in fact occur. Blue Mountains Biodiversity Project, 161 F.3d at 1212. An agency "cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 864 (9th Cir. 2005).

■■■■ In order to determine whether an action "significantly" affects the environment an agency must consider the context and intensity of the project. 40 C.F.R. § 1508.27. Context means "that the significance of an action must be analyzed in several contexts such as society as a whole, the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and requires the responsible officials to consider ten separate factors in order to evaluate an action's intensity. 40 C.F.R. § 1508.27(b). The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances." Ocean Advocates, 402 F.3d at 865 (citing Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001) abrogated in part by Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

■■■■ The USFS published its EA and DN/FONSI at the end of August 2012. Plaintiff claims this decision was arbitrary and capricious because the Project implicates six of the ten intensity factors.[1] Thus, Plaintiff argues, an EIS was required.[2]

#### a. Context

■■■■ The significance of a project "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Thus, "[c]ontext simply delimits the scope of the

---

1. These six factors as discussed as follows in Part III.C.1.b–g are: 40 C.F.R. § 1508.27(b)(3) unique characteristics of the geographic area; (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (9) the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical; and (10) whether the action threatens a violation of Federal

State, or local law or requirements imposed for the protection of the environment.

2. Plaintiff occasionally cites to findings in the 2014 BiOp. At the time the DN/FONSI issued, USFS only had the 2012 BiOp. The Court will only consider what was in front of the agency at the time of decision. See Conservation Cong. v. Heywood, No. 2:11-cv-02250, 2015 WL 5255346, at *8 (E.D. Cal. Sep. 9, 2015) ("Review under the APA is to be based on the full administrative record that was before the agency at the time it made its decision.") (citations and quotation marks omitted).

agency's action, including the interests affected." Babbitt, 241 F.3d at 731. "Both short– and long-term effects are relevant." 40 C.F.R. § 1508.27(a).

The Smokey Project is located in the Mendocino National Forest in Northern California. FS–21. The vast majority (about 80%) of the Project will take place in the Buttermilk LSR, with the remainder occurring in matrix lands (12%), riparian reserves, and the Grindstone Inventoried Roadless area. FS–21–22. Portions of the Project will take place in the NSO's designated critical habitat as determined by the 2012 Critical Habitat Rule. FS–4, 19101–2. The region's characteristics are discussed in more detail below. Plaintiff does not challenge the Project on context grounds. See P. MSJ at 15.

b. Unique Characteristics of the Geographic Area Such as Proximity to Historic or Cultural Resources, Park Lands, Prime Farmlands, Wetlands, Wild and Scenic Rivers, or Ecologically Critical Areas

 The parties substantially agree that the Buttermilk LSR is a unique and important region of the Mendocino National Forest, especially with respect to late successional habitat dependent species like the NSO. P. MSJ at 1; FS–42, 211, 5320, 5324. This consensus is not dispositive: "proximity of a project to a sensitive area does not per se warrant an EIS." Klamath Siskiyou Wildlands Ctr. v. Grantham, 424 Fed.Appx. 635, 638 (9th Cir. 2011). Plaintiff must also "explain how the project would have a 'significant effect' on [the area]." Id. The Court thus considers the region's uniqueness in light of the remaining factors.

c. The Degree to Which the Effects On the Quality of the Human Environment Are Likely to Be Highly Controversial

 A project is "controversial" in "cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric., 681 F.2d 1172, 1182 (9th Cir. 1982). The Ninth Circuit has found sufficient controversy where an agency "received numerous responses from conservationists, biologists, and other knowledgeable individuals [–including two California State Departments–] all highly critical of the EA and all disputing the EA's conclusion[.]" Id. In contrast, where a dispute is limited to disagreement between qualified experts over what the data reveals, the Circuit has deferred to the agency. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1335 (9th Cir. 1992) ("If this type of disagreement were all that was necessary to mandate an EIS, the environmental assessment process would be meaningless.").

Plaintiff contends that there is a substantial dispute as to the effect of the project on the continued existence of the NSO and as to the actual impacts of active management—to this degree—in NSO habitat. P. MSJ at 23; Plaintiff's Consolidated Reply ("P. Rep."), ECF No. 114, at 24–25. Plaintiff cites the scientific debate described in the 2011 RRP as evidence of the "ongoing debate" over these issues. Id.

The USFS addressed this controversy in the EA. FS–42–44. The EA notes several papers that support Plaintiff's position—which Plaintiff raised in comments to the Project—and acknowledges the disagreement in the scientific community. FS–43. The EA then explains that the USFS relied on publications and observational data more specific to the relevant area in developing the Project. Id. The EA also explains that the Project does not conflict with findings that burned forests may benefit the species because the Project aims to

manage stands to reduce the risk of mortality rather than eliminate fire occurrence entirely. Id.

As Plaintiff points out, the RRP also acknowledges the disagreement in the scientific community on these issues. See FS–4287. The RRP discusses publications similar to those Plaintiff raised in its comments to the Project. It addresses the issue as follows:

> This debate focuses on uncertainty and seems to be one of degree rather than fundamental difference in long-term conservation goals. We would like to build on areas of agreement for spotted owl recovery, but we recognize that many of these recommendations are controversial due to political and socio-economic reasons. However, given the need for action in the face of uncertainty, we continue to recommend that land managers implement a program of landscape-scale, science-based adaptive restoration treatments in disturbance-prone forests[.]

FS–4287. In another section, the RRP recognizes that its recommendation to apply "active forest management" "may be controversial" due, in part, to the different risks, benefits, and predictability of treatment in different areas. FS–4277.

▮▮ This evidence of some disagreement in the scientific community does not make this particular Project "highly controversial." The USFS explained why its conclusions differ from Plaintiff's position and the cited publications. Its explanation accords with the RRP's observation that the benefit of forest management will vary by forest area. See FS–4277. The USFS considered opposing viewpoints and chose to rely on the conclusions of its own experts; those conclusions are tailored to this specific Project. This cited disagreement does not trigger the "highly controversial" factor.

▮▮ Plaintiff also argues that the disagreement between the USFS and FWS employees over the MALAA determination, documented in inter-agency and intra-agency emails, constitutes controversy. The Court does not agree that this early disagreement mandates an EIS. Plaintiff's argument centers on emails from 2010 and 2011 and concerns a dispute as to whether a formal FWS consultation was necessary. See generally FWS–1–1161; P. MSJ at 23; P. Rep. at 7–11. Despite that disagreement, the USFS moved forward with formal consultation and later agreed that with the FWS's determination. FWS–1111–14, 1285. Plaintiff does not point the Court to any evidence in the decision documents that indicates the agencies continued to feud over the Project's impacts. In fact, the USFS addressed the initial disagreement in the EA:

> The context of determining the threshold of 'may affect,' likely to adversely affect' is an individual animal; the intensity threshold is very low, such that effects as minor as changes in foraging patterns and with probabilities as low as 'not discountable' receive a MALAA call. It is not highly controversial to differ on such fine points.

FS–44. The agency also stated, several times, that it ultimately defers to the FWS on the determination. FS–44, FS–53. The early emails alone do not indicate that the Project in its final form is "highly controversial." See Friends of the Earth v. Hintz, 800 F.2d 822, 834 (9th Cir. 1986) (finding that early comments indicating a contrary position did not render the final decision arbitrary and capricious) ("Certainly, the Corps' initial comments were preliminary and subject to change as understanding of permit issues expanded, the factual record developed, and the mitigation plan created.").

d. The Degree to Which the Possible Effects On the Human Environment Are Highly Uncertain or Involve Unique or Unknown Risks

 "[T]he regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." Envtl. Prot. Info. Ctr. v. U.S. Forest Service, 451 F.3d 1005, 1011 (9th Cir. 2006) ("EPIC"). The use of the word "highly" means that information merely favorable to a plaintiff does not necessarily reach the significance threshold. Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1240 (9th Cir. 2005). "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent 'speculation on potential ... effects.'" Id. (quoting Babbitt, 241 F.3d at 731–32).

 Plaintiff directs the Court to FWS's acknowledgment—in its email communications and the 2011 RRP—"that there are significant scientific uncertainties both as to the impacts of wildfire on NSOs and as to the risks of forest treatments intended to reduce wildfire risk." P. MSJ at 23; P. Rep. at 22. As discussed in the previous section, the 2011 RRP acknowledges that the expert disagreement regarding the impact of wildfire and active forest management on NSOs centers on uncertainty. FS–4287 ("This debate focuses on uncertainty and seems to be one of degree rather than fundamental difference in long-term conservation goals."). The RRP also discusses the uncertainties associated with barred owls, FS–4252, climate change, FS–4265, decision-making in light of past management activities, Id. and the short- and long-term effects of ecosystem restoration, FS–4280. Additionally, Plaintiff argues, the RRP emphasizes an "adaptive management" approach to man-

agement decisions due to such uncertainties. P. Rep. at 23 (citing FS–4237, 4260, 4261, 4306).

Although these documents do indicate uncertainty with respect to NSO recovery efforts, Plaintiff does not tailor its argument to the context of the Project at issue. To an extent, the Court may infer from these generalities that aspects of the Project cross into uncertain territory. But the Court cannot conclude, without more, the degree that this Project's possible effects on the human environment are highly uncertain. Plaintiff has not argued that the Project's forest management techniques are new, unique to the region, or experimental such that the results are unpredictable. Cf. Ore. Wild v. Bureau of Land Mgmt., No. 6:14-cv-0110, 2015 WL 1190131 (D. Ore. Mar. 14, 2015) (finding the effects of a pilot project to be "highly uncertain").

Plaintiff further points out that there is a self-inflicted dearth of information with respect to the effects of projects like this in the Mendocino National Forest. P. Rep. at 23–24; P. Rep. at 4, n.1; see supra "Factual Background" (describing "Monitoring Requirements"). The record reveals that the USFS had failed to satisfy its monitoring obligations for other projects prior to its approval of this one. Plaintiff raised the USFS's failure to monitor its past projects in its initial comments: "[W]e have significant objections to this type of vegetation management in LSR when the Mendocino NF has violated its monitoring reporting requirements to the FWS for NSO for the life of the LRMP [(Land and Resource Management Plan)]." FS–174. The USFS's response, attached to the final EA in Appendix Z: "The forest has not done the monitoring." Id. Plaintiff renewed its concern during the Objection Period:

Through a FOIA request the Conservation Congress has documented that the

NMF [sic] has never submitted a monitoring report to the USFWS that is required under Enforceable Terms and Conditions found in Biological Opinions. By not submitting these mandatory reports during the life of the LRMP, 15 years, the MNF has allowed the Environmental Baseline for the NSO to become invalid. The MNF has not documented the amount of owl habitat that has been removed, degraded, or downgraded not [sic] has it kept up to date its incidental take database. The Forest has also failed to ever conduct any emergency consultations with the USFWS after wildfires affected CHU/LSR.

FS–1561. The Reviewing Official responded: "The [MNF] acknowledges that the cited requirements have not been met, and is in the process of compiling information to satisfy monitoring requirements of past Biological Opinions for reporting to USDI–FWS and NOAA Fisheries." FS–1539. That response issued September 15, 2010. The EA does not address the lack of monitoring in its uncertainty analysis.

Although the Court is concerned by these admissions, it lacks the context it would need to evaluate the degree to which the deficiency makes the Project's impacts "highly uncertain." The Court cannot readily determine how this data would change the analysis supporting the Project. Despite the lack of monitoring, the BiOp contains over eighty pages of NSO related analysis, including the Status of the NSO, Environmental Baseline, Effects of the Proposed Action, Cumulative Effects, and Critical Habitat. FS–18699–787. Both the BA and the BiOp reference NSO numbers, distribution, and survey data. FS–214–215, 18730–33, 18741–42. Without more, the Court cannot find that the USFS's conclusion on this factor was arbitrary.

e. Whether the Action is Related to Other Actions With Individually Insignificant But Cumulatively Significant Impacts

"Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(9). "The general rule under NEPA is that, in assessing cumulative effects, the agency must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and the differences between the projects, are thought to have impacted the environment." Cascadia Wildlands v. Bureau of Indian Affairs, 801 F.3d 1105, 1111 (9th Cir. 2015). "Consideration of cumulative impacts requires some quantified or detailed information that results in a useful analysis, even when the agency is preparing an EA and not an EIS." Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1007 (9th Cir. 2011) (internal quotation marks and citations omitted). NEPA does not mandate that the effects be presented in a particular form; an agency has discretion in deciding how to organize and present information. See Mont. Wilderness Ass'n v. Connell, 725 F.3d 988, 1002 (9th Cir. 2013).

Plaintiff first challenges the scope of the EA's cumulative impacts analysis, arguing that the USFS "irrationally limited [the analysis to] the perimeter of the immediate project area and fail[ed] to account for the impacts of the Project together with other actions affecting the NSO in the critical Buttermilk LSR." P. MSJ at 21–22. It argues that because the USFS has recognized the critical importance of the Buttermilk LSR, it should have analyzed the

cumulative effects of the Project at that scale. P. MSJ at 22.

■ Courts generally "defer to an agency's determination of the scope of its cumulative effects review" and deference is warranted in this case. See Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) (upholding Forest Service's cumulative effects analysis that only considered the west side of the forest rather than the entire forest); see also Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) ("[D]etermination of the extent and effect of [cumulative environmental impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."). The BA—the document cited in the EA for the NSO cumulative effects analysis—analyzes the environmental baseline and cumulative effects at the scale of the "Action Area." This area includes "the proposed treatment units plus a 1.3 mile radius surrounding the unit boundaries." FS–188. The BA explains that this acreage is used to account for those species that are wide ranging, like the NSO. Id. The Action Area encompasses 35,023 acres while the area of the proposed treatment units amounts to 6,337. Id. This delimited area appears to account for the location and movement patterns of the NSOs, thus warranting the Court's deference on this issue.

Plaintiff further argues that the NSO analysis is inadequate because "private actions are nowhere considered in the EA or any other environmental documentation for the project." P. MSJ at 22. Actually, private actions are briefly discussed in the "Summary of Cumulative Effects" section of the BA, which the EA references. FS–267; see also FS–45 ("Both private land and Forest Service are accounted for in this analysis."). The BA identifies over-

lapping parcels of private land and states their apparent use, including some "light to moderate selective harvesting." Id. As for smaller personal inholdings, it states that future management is unknown though "it can be predicted that some may be harvested, used for recreation, developed, or burned through prescribed fire." Id. A few lines down the BA concludes: "Considering potential Federal and other management activities, the home ranges would continue to provide adequate habitat for reproducing pairs. Suitable habitat on private land was not considered as part of this analysis. Loss of habitat on private land would not affect the suitability of these home ranges." Id. This final sentence indicates that even if private landholders harvested their land, the NSO home ranges would remain intact. Plaintiff does not identify any particular private projects that the USFS should have accounted for and the Court cannot speculate that any such "reasonably foreseeable" actions were omitted.

■ Lastly, Plaintiff contends that the cumulative effects analysis is inadequate with respect to past projects. P. MSJ at 22; P. Rep. at 22 (conceding that the USFS did provide a more nuanced discussion of concurrent and future projects). The Court finds that the USFS adequately addressed past actions. Under Ninth Circuit precedent, an agency "may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured." Cascadia Wildlands, 801 F.3d at 1111. The BA first addresses past actions in the subsection on "Baseline Information." See FS–204–228. With respect to forest management, the BA provides a table of past timber sales with the year and the number of acres sold. FS–205. It then measures the footprint of what was harvested (4,468,

13% of the Action Area) and identifies the subset of that footprint that remains in a plantation type condition (1,500 acres, 4% of the Action Area). Id. It concludes that about half of those remaining acres currently provide foraging quality habitat. Id. Several pages later, the BA turns to the NSO and discusses its present status and environmental baseline. FS–214–15. The BA is only one of multiple reports cited in the EA, each of which assess the cumulative effects of the project with respect to particular resources. See, e.g., Fuels Report, FS–539–56 (discussing "Existing Conditions" and "Actions (past, present, future) significant to cumulative effects"). Plaintiff has not identified any past projects or events that USFS failed to account for; thus, the Court has no reason not to defer to the agency on this issue as well.

f. The Degree to Which the Action May Adversely Affect An Endangered or Threatened Species or Its Habitat That Has Been Determined To Be Critical Under the Endangered Species Act of 1973

 "NEPA regulations direct the agency to consider the degree of adverse effect on a species [or critical habitat], not the impact on individuals of that species." EPIC, 451 F.3d at 1010. It is therefore not the case that any impact to a listed species requires an EIS. See id. at 1012. The USFS evaluates this significance factor based on "the capability of the affected area to support overall viability of affected endangered or threatened species." FS–50 (citing Wildlife Specialist Report, July 16, 2010, and Methodology for MIS Analysis, 2009).

As described in the "Factual Background," above, the EA concludes that the Project's impacts to the NSO are not significant. FS–53. The EA cites each agency's conclusion that although there is po-

tential for harm to individual NSOs, that potential is short term. Id. It cites the BiOp's conclusion that the Project will not jeopardize the continued existence of the species at either the range-wide or the recovery unit scale, as well as the favorable conclusions in the BA and Wildlife Specialist Report. Id. The USFS determined: "Based on the small number of owls impacted, the short-term nature of the impacts, the undiminished functionality of all affected suitable habitat, and the continued ability of the area to support viability, the impacts to NSO are not significant." Id.

Plaintiff argues that the USFS's conclusion is untenable given the MALAA determination and FWS's findings throughout the record that the project would significantly impact NSOs. P. MSJ at 16–17. Plaintiff points out that the BiOp uses the term "significant" in multiple places. See, e.g., FS–18757 ("Commercial thinning, fuels treatments, and habitat enhancement treatments are expected to result in significant effects to [NSO] breeding, feeding, and/or sheltering ..."), 18766 ("Smoke disturbance and habitat manipulation are expected to cause significant impairment of breeding, feeding, and sheltering of [NSOs] at this activity center during years 3, 4, and 5"). Defendants argue that significance is a term of art in the NEPA context and it is the USFS's determination, not the FWS's use of the term, that dictates whether an EIS is required. Federal Defendants Cross–Motion for Summary Judgment ("D. Cr. Mot.") at 17.

 Although the Project will have some impact on the NSOs in the Project area, the Court defers to the USFS's finding that the impact is not significant. The Court finds the Ninth Circuit's analysis in EPIC instructive. In that case, the plaintiff argued that an EIS should have been prepared because the project at issue was

"likely to affect the NSO and its critical habitat significantly." EPIC, 451 F.3d at 1010. The FWS's BiOp reported that " 'three nest sites could be destroyed' and that the logging [would] remove 'most, if not all, of the small amount of existing nesting habitat' within the critical habitat units." Id. Of the 578 acres to be logged in the Klamath National Forest, 125 acres had been designated critical habitat. Id. Fourteen acres of nesting habitat was set to be removed, fifty-one acres of high quality nesting habitat would be degraded to moderate quality, and the remaining sixty acres—only suitable for dispersal—would maintain its dispersal function post-harvest. Id. Despite these certain and potential losses, the EPIC court deferred to the agency. It reasoned as follows:

> These statements, however, must be read in context. For example, although the logging will remove existing nesting habitat from two critical habitat units, this amounts to a total of only fourteen acres. Similarly, the Project does not authorize the destruction of any existing nest sites, and surveys and seasonal restrictions operate to protect potentially occupied nest sites. The projected take of three nests or pairs of owls is based on extrapolations from nesting data, and FWS determined that this level of anticipated take was permissible under the ESA.

EPIC, 451 F.3d at 1010. In conclusion, the Ninth Circuit held "[i]t was not arbitrary and capricious for USFS to determine that although there will be some effect on individual pairs, this will not cause a significant adverse effect on the species and require an EIS." Id. at 1011.

Although the project in EPIC was much smaller than the Project in this case, the proposals have similar projected impacts. This Project is expected to degrade habitat in two activity centers, resulting in signifi-cant effects for the owls in those centers; "take in the form of harm of juvenile [NSOs] and harassment of adult [NSOs]" is expected. FS–18789–90. Implementation of the LOP is expected to decrease the risk of harm to young in one of those centers. FS–18792. No loss of NSO habitat is expected and habitat function of the treated areas will be maintained (minus one linear unit for a temporary road). FS–18788. Habitat degradation is expected to be short-term, returning to normal after two to three years. FS–52, 18788. Unlike the EPIC project, no NSO habitat will be removed and no destruction of nest sites is anticipated. Thus, following the EPIC court's directive that significant effects to individual owls does not necessarily imply significant effects to the species, this Court finds that the USFS's "effects" conclusion was not arbitrary and capricious.

Plaintiff's additional arguments on this question are unavailing. Plaintiff argues that the USFS improperly relied on the FWS's "no jeopardy" determination in order to justify its conclusion regarding significance. P. MSJ at 19. This characterization of the agency's determination is inaccurate; the USFS refers to the Biological Assessment, Biological Opinion, and Wildlife Specialist Report Plaintiff in support of its determination. FS–53. It is entirely proper for the USFS to consider the FWS's findings, along with the findings in these other documents, in reaching its conclusion. See EPIC, 451 F.3d at 1012 ("Clearly, NEPA and the ESA involve different standards, but this does not require the USFS to disregard the findings made by FWS in connection with formal consultation mandated by the ESA."). Finally, Plaintiff argues that the FWS's findings should not inform the USFS's conclusion because those findings relate to the range-wide and recovery unit scale impacts, rather than the Buttermilk LSR. P. MSJ at 19. As already

discussed, NEPA requires the USFS to consider the degree of adverse effect on a species, not individuals. EPIC, 451 F.3d at 1010. Plaintiff fails to explain how a range-wide or recovery unit-scale analysis would impede the USFS in fulfilling its obligation.

### g. Whether the Action Threatens a Violation of Federal, State, or Local Law or Requirements Imposed For the Protection of the Environment

Plaintiff claims that because the Project violates the NFMA, the USFS is required to prepare an EIS. Plaintiff argues that the DN/FONSI's claim that the project is consistent with the Mendocino National Forest Land and Resource Management Plan ("LRMP" or "Forest Plan") is contrary to FWS's express finding that the Project is inconsistent with portions of Recovery Action 10 of the RRP. P. MSJ at 20 (citing FS–18983). The Court will fully address Plaintiff's claims with respect to the National Forest Management Act and 2011 Revised Recovery Plan in Part III.E, below. The Court concludes that the Project does not violate the NFMA.

### h. Conclusion

None of the issues Plaintiff raises—either separately or taken together—mandates preparation of an EIS. The Court finds for the Defendants on this claim.

### 2. Failure to Analyze Cumulative Impacts

Plaintiff asserts the failure to evaluate cumulative impacts of the proposed action as a separate NEPA cause of action. Compl. at 26. In its briefs, Plaintiff's only arguments with respect to cumulative effects are contained under the cumulative effects intensity factor, addressed at Part III.C.1.e, supra. See P. MSJ at 20. As the Court concluded above, the USFS addressed the cumulative effects in the EA and the underlying reports. The Court

rules in favor of the Defendants on this claim.

### 3. Failure to Develop Alternatives

Plaintiff argues that the USFS's alternatives analysis was inadequate because the Project's stated purpose is arbitrary and because the USFS failed to consider a proposed, reasonable alternative. The Court agrees that the alternatives analysis is inadequate.

### a. Purpose and Need of the Project

The purpose and need of a project defines the scope of the alternatives analysis and an agency need only evaluate alternatives that are reasonably related to the project's purposes. League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Service, 689 F.3d 1060, 1069 (9th Cir. 2012). Courts afford agencies "considerable discretion to define the purpose and need of a project." Id. (citations and quotation marks omitted). However, because "the stated goal of a project necessarily dictates the range of reasonable alternatives [,] [ ] an agency cannot define its objectives in unreasonably narrow terms." City of Carmel–By–The–Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997).

The Project's purpose and need, as articulated in the EA, is the following:

> The purpose of [the Project] is primarily to contribute to achieving wildlife habitat, fire management and secondarily to timber production goals established by the MHF Forest Plan. There is also a need to comply with applicable management direction of the Forest Plan, Forest Service Policy regulations and laws. Thus the proposal includes design features and requirements to ensure environmental compliance in addition to the activities that would achieve the Forest Plan goals.

FS–23. Plaintiff contends that this purpose is arbitrary because it conflicts with the 2011 RRP. P. MSJ at 12. Plaintiff argues that this purpose "ineluctably led the USFS to consider only a single irrational action alternative for the Project." Id.

The Project's purpose does not conflict with the RRP as Plaintiff claims. The RRP repeatedly states that it support forest management practices that aim to restore more natural vegetation patterns and fire regimes, including management in certain areas to reduce fire severity. See, e.g., FS–4298–99. The above quoted purpose does not contradict this advice. The term "fire management" is broad and may be understood to encompass the type of management the RRP favors. Furthermore, Plaintiff's own proposed alternatives, described below, belie the fact that the Project's purpose was not so narrowly drawn as to preclude consideration of other alternatives.

### b. Alternatives Analysis

Alternatives analysis is the heart of the environmental impact statement. 40 C.F.R. § 1502.14. The analysis "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." Id.

Under NEPA, "[a]gencies are required to consider alternatives in both EISs and EAs and must give full and meaningful consideration to all reasonable alternatives." Te–Moak Tribe of West. Shoshone of Nev. v. U.S. Dep't of Interior, 608 F.3d 592, 601–02 (9th Cir. 2010). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." Morongo Band of Mission Indians v. F.A.A., 161 F.3d 569, 575 (9th Cir. 1998) (internal quotation marks and citation omitted) (applying this rule in the EA context). Projects authorized under the HFRA—like this one—need only consider three alternatives: the proposed agency action; the alternative of no action; and an additional action alternative, if the additional alternative—(i) is proposed during scoping or the collaborative process under subsection (f); and (ii) meets the purpose and need of the project, in accordance with regulations promulgated by the Council on Environmental Quality. 16 U.S.C. § 6514(c).

The parties agree that under the HFRA, the USFS is required to consider one additional action alternative provided that the above conditions are met. The parties dispute whether those conditions were met in this instance. Plaintiff argues that it proposed a viable action alternative that the USFS failed to consider. P. MSJ at 13; P. Rep. at 16. Specifically, Plaintiff contends that the following sentence, from its First Objection, raised an alternative that should have been considered: "To meet the intent of the LRMP, prescriptions should be designed to only maximize volume over other resources in the suitable timber base, not LSR. This is despite the reality that more limited thinning from below prescriptions with quantitative diameter limits (e.g. no big trees over 18' DBH will be cut in LSR) were a viable option that would meet all HFRA objectives, while also being consistent with LSR duties." FS–1580. The USFS did not consider an 18' DBH diameter cap.

Intervenor asserts that the USFS did not need to consider Plaintiff's diameter cap recommendation because the alternative was not raised during the first scoping period. Defendant–Intervenor's Cross–Motion for Summary Judgment ("I. Cr. Mot."), ECF No. 109, at 9–10; Defendant–Intervenor's Reply ("I. Rep."), ECF No. 115, at 7. This argument is not persuasive.

The HFRA requires an agency to consider an action alternative raised during scoping or the collaborative process under subsection (f). 16 U.S.C. § 6514(c)(1)(C)(i). Subsection (f) prescribes "Public Collaboration" consistent with the "Implementation Plan," that encourages meaningful public participation during preparation of authorized hazardous fuel reduction projects. 16 U.S.C. § 6514(f). What constitutes the "collaborative process" is not clear; it does not appear that another court has had an opportunity to delimit the phrase. However, under basic principles of statutory interpretation, the Court may infer that the "collaborative process" means something beyond "scoping" or the addition would be superfluous. See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."). Based on the Plaintiff's active participation throughout the iterations of the Project—as described in the "Factual Background"—the Court concludes that Plaintiff's suggestions were made during the collaborative process.

Defendants focus their argument on Plaintiff's form rather than timing. They argue that Plaintiff did not suggest an 18' DBH cap "outright" but merely did so "in passing" such that it failed to actually suggest an alternative that the USFS was required to consider. D. Cr. Mot. at 15–16; Federal Defendant's Reply ("D. Rep."), ECF No. 117, at 4.

This argument is also unpersuasive. The USFS nominally considered a diameter cap alternative in the EA. Under "Alternatives not Considered in Detail," the USFS

lists "Using a diameter limit, removing no trees over 10' DBH" as an "alternative [ ] suggested by comments received during both scoping comment periods." FS–36–37. It then states that this cap would not meet the purpose and need of the project. Id. Plaintiff calls this "10' diameter cap" a "strawman alternative." P. MSJ at 13. After comparing the "Alternatives Analysis" in the EA to the comments and objections in the Administrative Record, the Court agrees. This Court's review of Appendix Z (Scoping Summary and Issue Identification), Supplemental Appendix Z (Smokey EA Supplement, Scoping Summary and Issue Identification), and the scoping documents included in the Administrative Record (FS–3240–3691) does not turn up any comments specifically suggesting a 10' diameter cap.[3] In contrast, there were multiple comments and objections suggesting a diameter cap for large trees and/or expressing concern over the cutting of larger trees. See, e.g.:

- FS–3629 ("The HFRA also has very strong direction regarding the maintenance of old growth and 'Large' diameter trees."—Conservation Congress ("CC"), 1st Scoping);

- FS–3629 ("There is not information regarding size classes or age class for either management area [ (LSR or Matrix) ] and this information needs to be disclosed."—CC, 1st Scoping);

- FS–3636 ("These concerns would be greatly reduced if you would adopt a maximum DBH size such as 24' for the trees that can be cut, especially in the LSR."—California Wilderness Center, 1st Scoping);

---

**3.** At the hearing, Defense counsel raised the possibility that this suggestion was made at a meeting between Conservation Congress and USFS representatives, but conceded that it was not documented in the record.

• FWS–61 ("Also is there a radius around the hardwoods that would be followed? Would it include removal of larger trees (24'+ dbh)?"—FWS, 1st Scoping);

• FWS–1162 ("There may be areas where 20–24' trees could be harvested without adverse effects, but those would be on a site specific basis depending on stand characteristics."—FWS, Rationale for [MALAA] Determination); [4]

• FS–1568 ("The HFRA was passed with significant duties to not cut larger diameter, big, or old growth trees whenever feasible. Meeting that duty was feasible in the Smokey Project area. However the Smokey proposed action was designed to include logging various big, large diameter, and old growth trees and forests in a manner that violates the new legislative standard."—CC, 1st Objection);

• FS–1569 ("The removal of large diameter trees is not necessary in order to attain the objectives of this HFRA project. Furthermore, the controversy over large trees has been expressed continually from multiple organizations and local residents throughout the past nearly two years of meetings and comments."—CC, 1st Objection);

• FS–1580 ("To meet the intent of the LRMP, prescriptions should be designed to only maximize volume over other resources in the suitable timber base, not LSR. This is despite the reality that more limited thinning from below prescriptions with quantitative diameter limits (e.g. no big trees over 18' DBH will be cut in

LSR) were a viable option that would meet all HFRA objectives, while also being consistent with LSR duties."—CC, 1st Objection);

• FS–3546 ("Yet a secondary purpose of the project is to achieve timber production goals established in the Forest Plan. It's clear the secondary purpose is actually the first, since almost 18% of the timber cut will be 24' DBH or greater."—CC, 2nd Scoping);

• FS–3547 ("The Supplemental BA information included a Cruise Data Sheet documenting the DBH of trees to be cut. According to this chart, 36.2% of the trees logged in Smokey will be 20' DBH or GREATER—up to 43' DBH. These trees in critical habitat should not be logged for any reason[.]"—CC, 2nd Scoping);

• FS–3547 ("We also note from out FOIA responsive records that the FWS requested diameter limits repeatedly for this project yet their requests were also ignored by the NMF.... [In phone calls, the DOI/FWS has] stated that trees over 24' DBH should not be logged in owl critical habitat.... The FS has never articulated a rationale for not providing diameter limits for timber projects in owl habitat despite repeated requests to do so. We surmise it is because it is proposing to log large diameter trees that should not be logged."—CC, 2nd Scoping);

• FS–3547 ("The NWFP, the Recovery Plan, and numerous scientific papers all use diameter limits regarding tree retention in owl habitat. The fact the Mendocino steadfastly re-

---

4. The Court agrees with Defendants that the FWS did not propose a 20' diameter cap as Plaintiff suggests. The quoted statement does, however, add weight to Plaintiff's point more generally.

fuses to adopt diameter limits makes all projects in owl habitat suspect."—CC, 2nd Scoping);

- FS–3552 ("The Forest states that 'tree diameters in Smokey would be much larger, averaging 22' dbh and higher.' However, it fails to mention what the average diameter could be if it implemented a restriction on the size of trees being cut (i.e. no trees harvested over 24' dbh)."—CC, 2nd Scoping);

- FS–3553 ("The removal of small diameter trees would improve the foraging habitat for Northern spotted owls. However, this project also proposed to remove large diameter trees.... [R]emoving the forest (or critical habitat components—large trees) is not compatible with the stated purpose of this project."—CC, 2nd Scoping).

■ The record is full of suggestions and concerns regarding diameter caps (18', 20', and 24') and retention of larger trees, and Defendants fail to explain why none of these triggered the HFRA requirement to prepare a single additional alternative. Although Plaintiff did not explicitly frame its suggestion as a "proposed alternative," the sampling of comments above show that Plaintiff did more than just mention a diameter cap "in passing." As Defendants note, "[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions." D. Rep. at 4–5 (quoting Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004)). Plaintiff—and others—did so here and the Court finds that the USFS's decision not to consider, or even acknowledge, an alternative with a larger diameter cap was arbitrary and capricious.

4. Failure To Take a "Hard Look" At Project's Impacts

■ Plaintiff argues that even if the Project does not require an EIS, the USFS still failed to take a hard look at the impacts of the Project in violation of NEPA. See Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059 (9th Cir. 2002). On this question, the Court primarily looks to the USFS's analysis in the EA, the underlying reports referenced therein, and the Supplemental Information Report, keeping in mind NEPA's twin aims of fostering better decision making and informing public participation for actions that affect the environment. See Ore. Natural Res. Council Action v. U.S. Forest Service, 293 F.Supp.2d 1200, 1204 (D. Ore. 2003).

An EA is a "concise public document" that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS; it aids an agency's compliance with NEPA when no EIS is necessary and facilitates EIS preparation when one is necessary. 40 C.F.R. § 1508.9(a). It must include "brief discussions of the need for the proposal, of alternatives as required by [NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). NEPA's requirements ensure "that the agency, in reaching its decision, will have available, and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." Ore. Natural Res. Council Action, 293 F.Supp.2d at 1204–05 (citations and quotation marks omitted). The Court is thus charged with reviewing the adequacy of the agency's analysis, while keeping

in mind that it is not the Court's role to order the agency to explain every possible scientific uncertainty. See The Lands Council v. McNair, 537 F.3d 981, 986 (9th Cir. 2008).

As previously explained, the USFS's failure to consider or address the alternatives raised during public collaboration renders the EA inadequate. This deficiency is one indication that the agency failed to take a hard look at the Project's impacts. Plaintiff raises several other concerns that further support such a finding.

The Limited Operating Period is stated inconsistently throughout the record, making it difficult for Plaintiff, the Court, the public, and perhaps even the agency to know exactly how the LOP operates. The DN/FONSI states that the Project incorporates the LOP required by the 2012 BiOp's ITS, but Appendix A of the EA states the LOP in different terms. Compare FS-18792 ("Implement a limited operating period .... in the units containing suitable nesting/roosting or foraging habitat.... If current protocol-level survey information is not current/available, a limited operating period [will be implemented within] ... any unsurveyed nesting/roosting habitat."—2012 BiOp) with FS-77 ("A limited operating period (LOP) for northern spotted owls would be applied to all units from February 1 to September 15 unless current protocol-level surveys indicate that they are unnecessary."—EA, Appendix A). The LOP again changes in the Supplemental BiOps (2014 and 2015), though the USFS states it will adhere to the LOP as written in the 2012 ITS. In April of last year, the USFS sent Trinity a letter listing the units where an LOP from February 1st to September 15th would apply, an LOP from February 1st to July 10th would apply, and where no LOP would apply in the event that no protocol surveys are not conducted in a given year.

ECF. No. 86-1. This advice conflicts with the LOP as written in Appendix A of the EA. Intervenor offers an explanation of how the list is consistent with the LOP as written in the 2012 BiOp's ITS, but that explanation is not readily discernable from the EA or the accompanying documents. See I. Cr. Mot. at 19. Even counsel's explanation at the hearing relied on data from several different sources; a clear and consolidated explanation is found nowhere in the record or documents made available to the public. The confusion makes it difficult to discern the Project's impacts in the circumstance that current protocol level surveys are unavailable. It also makes it difficult for the public to play a role in the decision-making process or project implementation, running counter to one of NEPA's principal aims.

As noted previously, this Court is concerned by the fact that the USFS has admittedly failed to do the monitoring required for other projects. Although the Court declines to find that this deficiency mandates preparation of an EIS, the fact that the agency fails to address this issue in its decision documents raises suspicion. While the concern is noted in Appendix Z of the EA, the agency merely admits that monitoring has not occurred and offers no explanation of why, no description of how the issue will be ameliorated, and no rationale for why this deficiency does not render the Project's impacts "uncertain." It does not appear the agency took a hard look at this question.

Plaintiff raises a number of other issues with the EA, most of which lack merit because the concerns are addressed in the Appendices and cited underlying reports. Of those concerns, the Court agrees that the EA contains varying statistics regarding the number of acres to be treated; while a thorough read of the decision documents clarifies these differences, the EA's

lack of precision does make the document confusing. Although this issue would not likely, by itself, warrant a finding against the USFS, the agency would be wise to be more careful in its revision.

Given the failure to address reasonable alternatives, the inconsistent LOPs, and the failure to address past monitoring practices, the Court finds that the USFS did not conform to NEPA and take the requisite hard look at the Project.

5. Failure to Prepare a Supplemental EA or EIS

 Although Supplemental Information Reports are not mentioned in NEPA or its regulations, courts recognize a "limited role" for them in environmental evaluation procedures. Idaho Sporting Congress Inc. v. Alexander, 222 F.3d 562, 566 (9th Cir. 2000). Courts have upheld their use in an agency's determination of whether new information or changed circumstances require the preparation of a supplemental EA or EIS. Id. "If the environmental impacts resulting from the design change are significant or uncertain, as compared with the original design's impacts, a supplemental EA is required." Id.

Plaintiff primarily argues that the SIR is arbitrary and capricious because it fails to address the USFS's "design change" in the LOP. P. MSJ at 24. The argument is based on the April 1, 2016 letter from the USFS to Trinity. P. MSJ at 24; P. Rep. at 25; ECF No. 86–1. The agency prepared the SIR in 2015 and thus this letter was not before it. The Court acknowledges that the LOP determinations and the 2016 letter are confusing. This concern is best addressed in the "hard look" analysis, above.

Plaintiff also argues that the USFS "piggybacks" on the FWS's no-jeopardy conclusion in the 2014 BiOp and thus failed to take a "hard look" at the impacts of the change in the NSO's critical habitat desig-

nation. P. MSJ at 24. This is not the case. The SIR relies on the BiOp in part, but does so broadly and in addition the 2014 Supplemental BA. The SIR cites to the lengthy analysis in both documents in support of its conclusion that "[t]he Smokey Project will have long term beneficial effects on [NSO] habitat and any adverse impacts to designated critical habitat would be minor and temporary." FS–3–5. Plaintiff does not claim the Supplemental BA was inadequate. Plaintiff points out that the USFS did not mention the declining NSO population in the SIR, but Plaintiff does not explain how this renders the determination inadequate.

In sum, the Court finds that the USFS's decision not to prepare a Supplemental EA or EIS was not arbitrary and capricious and finds for Defendants on this claim.

D. ESA Claims

 The ESA requires any federal agency seeking to implement a project that could adversely affect the habitat of an endangered or threatened species to go through a formal consultation process with the FWS. 16 U.S.C. § 1536(a)(2); Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service, 378 F.3d 1059, 1063 (9th Cir. 2004). Before the consultation begins, the agency must submit a "biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected" by the agency's proposed action. 16 U.S.C. § 1536(c). Prior to and during the consultation process, the federal agency and the FWS must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)-(c). At the end of the formal consultation process, the FWS must issue a Biological Opinion ("BiOp"). 16 U.S.C. § 1536(b)(3)(A). A BiOp is a "written statement setting forth the Secretary's opinion,

and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." Id. If the FWS believes that the project will jeopardize a listed species or adversely modify the species' habitat, "the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action." Id. The biological opinion is considered a final agency action and is subject to judicial review. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 925 (9th Cir. 2008).

The ESA also prohibits any federal agency from "taking" a listed species. 16 U.S.C. § 1538(a)(1). To "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). If the federal action will result in the taking of an endangered or threatened species incidental to the agency action, the action may still go forward if the FWS approves of it through an Incidental Take Statement ("ITS"). 16 U.S.C. § 1536(b)(4); Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1239 (9th Cir. 2001). The ITS specifies the impact of the incidental take on the species, the measures necessary or appropriate to minimize impact, and the terms and conditions that must be complied with by the applicant agency to implement those measures. Id. If an agency modifies the action it intends to take or does not comply with the ITS, the agency must reinitiate consultation with FWS. 50 C.F.R. § 402.16.

### 1. Arbitrary and Capricious Supplemental Biological Opinion

■ The jeopardy and adverse modification determinations are made pursuant to governing regulations. To " 'jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species." Id. The Ninth Circuit has held that the reviewing agency must consider both recovery and survival impacts in these determinations. Nat'l Wildlife Fed'n, 524 F.3d at 930 (9th Cir. 2008) (holding that the jeopardy definition requires consideration of recovery); Gifford Pinchot Task Force, 378 F.3d at 1070 (holding that the adverse modification regulations "singular focus" on survival violated the ESA). However, it is not necessary that a federal action would itself implement or bring about recovery. Cascadia Wildlands v. Thrailkill, 49 F.Supp.3d 774, 787 (D. Ore. 2014).

■ In making these determinations, an agency must use the best available scientific and commercial data available. 16 U.S.C. § 1536(a)(2); see San Luis & Delta–Mendota Water Auth. v. Jewell, 747 F.3d 581, 601–02 (9th Cir. 2014). Insufficient or incomplete information does not excuse an agency's failure to comply where there was some additional superior information. Jewell, 747 F.3d at 602. However, "where the information is not readily available, we cannot insist on perfection." Id. Where a plaintiff fails to point to data omitted from consideration, the claim fails. Kern Cnty. Farm Bureau v. Allen, 450 F.3d 1072, 1081 (9th Cir. 2006).

Plaintiff provides four reasons why the operative BiOp, the Second Supplemental

BiOp, fails to satisfy the ESA and is thus arbitrary and capricious.

First Plaintiff argues that the FWS's determination that the Project will not jeopardize the NSO or adversely modify its critical habitat is irrational due to the FWS's own contrary findings. P. MSJ at 26. Plaintiff directs the Court to a line in the BiOp where the FWS indicated that the Project is inconsistent with the 2011 RRP. FS–19319–20 ("The proposed action meets most of the recommendations of the Recovery Plan, but is inconsistent with portions of Recovery Action 10[.]"). Because the FWS must consider NSO recovery in its analysis, Plaintiff argues that FWS's determination that the Project is inconsistent with "the critical recovery action" contradicts its jeopardy and adverse modification determinations. P. MSJ at 27.

The FWS adequately considered NSO recovery in its analysis, Plaintiff just does not agree with its conclusions. See FS–19319–21. First, the agency's finding that the Project is inconsistent with portions of one recovery action is not dispositive because the 2011 RRP, and the recommended recovery actions contained therein, is not a regulatory document and is not binding on the agency. See Conservation Cong. v. Finley, 774 F.3d 611, 614 (9th Cir. 2014); Cascadia Wildlands v. Thrailkill, 49 F.Supp.3d at 787. Furthermore, a fair reading of the 2011 RRP and Recovery Action 10 reveals that the plan anticipates the balance of competing forest management goals and acknowledges that short-term habitat degradation may sometimes be appropriate to achieve long-term forest health. See Conservation Cong. v. Heywood, 2:11–cv–02250, 2015 WL 5255346, at *12 (E.D. Cal. Sep. 9, 2015) ("Thus, the RRP does not recommend forgoing all land management activities to avoid short-term consequences to the NSO, and instead appears to support the proper imple-

mentation of projects like this."). The FWS's conclusion indicates the Project comports with this guidance: "Short-term adverse effects to [NSOs] in the action area due to project implementation are not expected to preclude recovery of the species in the recovery unit ICC or range-wide. Long-term, the Smokey Project will provide benefits to the [NSO] through increased resiliency of habitat." FS–19321. No violation is found on this basis.

Plaintiff next argues that the FWS's endorsement of the placement of Activity Centers is not rationally connected to NSO habitat needs. P. MSJ at 27. Specifically, Plaintiff takes issue with the placement of Activity Center 3063 and directs the court to the USFS biologist's characterization of her work as a "crap shoot." FWS–2873. Plaintiff argues that this admission of "speculation and surmise" and "shoddy work" does not meet the requisite level of caution and expertise. P. MSJ at 27–28.

These comments occurred in the context of a larger conversation. In a phone meeting, employees from both services decided that two additional Activity Centers should be designated in the Project's action area and that the two MNF employees would "determine where to place the AC cite on the landscape, based on information from the 2013 survey report (the direction in which the pair flew off once they were offered mice) and the best habitat available." FWS–2872. Following that conversation, the USFS biologist sent the FWS biologist an email that said: "This new AC designation is going to be a crap shoot. Take a look in Google Earth—the best stuff looks to be about ½ mile east from the 2013 pair sighting." FS–2873. The biologists continued their consultation over email for several days, which involved multiple maps and images, survey data, and discussion of best suitable habitats. FWS–2873–81, 2887–88, 2901–04, 2926, 2930–31.

The USFS biologist sent a map to FWS with the statement, "Here's my guess at what's nesting/roosting and foraging. Let me know what you think and I'll charge forward from there." FWS–2894.

Although the USFS's candid commentary may indicate that the new Activity Center was not determined to the degree of scientific certainty Plaintiff desires, Plaintiff does not present any data that the agencies failed to consider in making the determination. Plaintiff refers to the FWS's Activity Center delineation "protocol," but the cited "protocol" says nothing about the way in which the agencies identify the location for a new activity center. See P. MSJ at 27 (citing FWS–1162) ("The U.S. Fish and Wildlife Service also uses a 0.5 mile radius circle around a [NSO] activity center to delineate the area most heavily used by the subspecies during the nesting season, also known as the core area."). Plaintiff states that the USFS located the core area associated with Activity Center 3063 "in such a way that the relevant NSO pair's nest site is outside of the core area." P. Rep. at 30. However, it does not appear that surveyors discovered an actual nest site, only that they detected owls that were "likely nesting," and the biologists based the activity center location on the direction the owls flew in and the habitat in the area. FS–19303; FWS–2872. Plaintiff's argument amounts to a challenge of the agencies' interpretation of the available data, to which this Court owes deference.

Third, Plaintiff argues that the BiOp fails to contain any analysis whatsoever of how the Project, together with other timber sale projects, will affect the continuing function of the Buttermilk LSR which is crucial to the conservation and continued survival of the NSO in northwestern California. P. MSJ at 28. The relevant regulations only require the agency to form an

opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(g). Plaintiff does not cite any authority for the proposition that the FWS needed to evaluate the continuing function of the Buttermilk LSR in its analysis. The Court will not impose such an obligation.

Finally, Plaintiff argues that the Operative BiOp is arbitrary and capricious because the LOP requirement in the Incidental Take Statement is different than the one in the 2012 BiOp. Specifically, the Operative BiOp does not appear to protect unsurveyed nesting/roosting habitat in the event that protocol level survey information is not current/available, in contrast with the 2012 BiOp, which offers protection in that situation. P. MSJ at 28; compare FS–18792 with FS–19325. However, the Operative BiOp is based on the Second Supplemental BA, which states that it intends to incorporate the terms and conditions of the 2012 BiOp, and thus the original LOP. The conservation measures in the Supplemental BA must be implemented, see FS–19290, and thus the original LOP is incorporated into the BiOp; the Court need not determine whether it was arbitrary and capricious for the FWS to approve the Project with a differently worded LOP.

2. The USFS's Failure to Insure Against Jeopardy and the Destruction or Adverse Modification of Critical Habitat

 Plaintiff claims that the USFS's authorization of the Project violates its substantive ESA Section 7(a)(2) duty not to undertake actions that "jeopardize" a listed species or "adversely modify" its habitat. P. MSJ at 29. Plaintiff argues that the USFS violated its obligations both because the BiOp is legally flawed and be-

cause new information undercuts the BiOp.[5]

■■■■ "Arbitrarily and capriciously relying on a faulty Biological Opinion" would violate an agency's Section 7 duties. Wild Fish Conservancy v. Salazar, 628 F.3d 513, 532 (9th Cir. 2010). "An agency's reliance on a biological opinion based on 'admittedly weak' information satisfies its ESA obligations as long as the challenging party can point to no new information undercutting the opinion's conclusions." Id.

Both of Plaintiff's arguments must fail. First, the Court has determined that the BiOp is legally sufficient. Further, contrary to Plaintiff's assertion in its Reply, the BiOp does address road maintenance activities. FS–19284. Second, the new information Plaintiff points to is the letter from the USFS to Trinity indicating which units will have a LOP if and when no current protocol level surveys are performed. ECF No. 86–1. This letter does not provide new information; it is the Forest Supervisor's interpretation of the Project's terms and conditions. As noted several times in this Order, the USFS will need to clarify the LOP so that the public and the agencies (and the courts) know what compliance looks like. However the Court does not hold, as a matter of law, that the USFS violated the ESA in issuing the letter.

3. USFS's Illegal and Prohibited Take

Plaintiff argues that because the BiOp is arbitrary and capricious, the Incidental Take Statement is invalid and all incidental take will be unauthorized and illegal. Plaintiff's argument rests solely on the Court's determination with respect to the BiOp. As the Court has found that the BiOp is not arbitrary and capricious, this claim also fails.

5. This argument relies, in part, on a declaration that has been stricken from the record.

E. NFMA Claim

"[T]he NFMA requires the Forest Service to develop a forest plan for each unit of the National Forest System." The Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008); 16 U.S.C. § 1604(a). "After a forest plan is developed, all subsequent agency action, including site-specific plans ... must comply with the NFMA and be consistent with the governing forest plan." Id. (citing Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 962 (9th Cir. 2002)); 16 U.S.C. § 1604(i).

By its terms, the Mendocino National Forest Plan incorporates the NSO Recovery Plan. See Conservation Cong. v. U.S. Forest Service, No. 2:15-00249, 2016 WL 727272 (E.D. Cal. Feb. 24, 2016) (finding that a similarly worded forest plan incorporates the NSO Recovery Plan). The Forest Plan's "Summary of the Analysis of the Management Situation: Resource Environment" states, with respect to wildlife and fish: "Management activities will comply with species recovery plans (threatened and endangered species) and habitat management plans, as they apply to the Mendocino National Forest." P. MSJ at 20; FS–5811 (emphasis added). In a later section on "Management Direction: Management Prescriptions," the Plan states: "Late–Successional Reserves are to be managed to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species including the northern spotted owl.... Activities required by recovery plans for listed threatened and endangered species take precedence over LSR standards and guidelines." FS–5819 (emphasis added).

The Court will not consider Plaintiff's argument based on that declaration.

Plaintiff argues that the Project violates the 2011 RRP for the NSO and is thus inconsistent with the Forest Plan and violates the NFMA. P. MSJ at 20. Defendants argue that the plan does not impose mandatory requirements. D. Cr. Mot. at 20.

■■■■ Although "recovery plan objectives are discretionary for federal agencies," Heywood, 2015 WL 5255346, at *1, that rule does not end the Court's inquiry. "[W]here an otherwise advisory document has been clearly incorporated into a Forest Plan or other binding document, its requirements become mandatory." Ecology Ctr. v. Castaneda, 574 F.3d 652, 660 (9th Cir. 2009). When such a document is incorporated into a forest plan, courts look to the language of the guideline to determine whether it creates a mandatory standard. Id. at 660. "[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding regulations." Id. "If the guideline language underlying the plaintiff's claim is merely advisory or aspirational, the answer must be 'no.'" Id. For instance, where a Forest Plan incorporated "Old Growth Guidelines," the Ninth Circuit declined to mandate compliance because the relevant portions were cast in suggestive (i.e. "should" and "may") rather than mandatory ("must" and "only") terms. Id. at 660–61.

■■■■ Applying these principles to the present dispute, it is clear that the cited sections of the 2011 RRP are merely suggestive and do not impose mandatory terms on the USFS.

Plaintiff first argues that the Project violates Recovery Action 10. In the 2014 and 2015 BiOps, the FWS expressly found that the Project "is inconsistent with portions of Recovery Action 10" in the 2014 BiOp as proof of this claim. P. MSJ at 20. The Recovery Action recommends that the USFS "retain and protect all current and historically occupied NSO habitat." P. Rep at 19–20.

The Court finds that the language of Recovery Action 10 is suggestive and framed in a manner that anticipates the balancing of competing goals. The RRP's Executive Summary defines Recovery Actions as "near-term recommendations to guide the activities needed to accomplish the recovery objectives and achieve the recovery criteria." FS–4239. Further, most of Recovery Action 10 consists of "interim guidance." This guidance suggests (i.e. "Land managers should ...") priorities for consideration, but recognizes the need for balance:

> As a general rule, forest management activities that are likely to diminish a home range's capability to support spotted owl occupancy, survival and reproduction in the long-term should be discouraged. However, we recognize that land managers have a variety of forest management obligations and that spotted owls may not be the sole driver in these decisions. Here, active forest management may be necessary to maintain or improve ecological conditions.

FS–4311–12. The Court cannot read this section to impose mandatory requirements on the USFS and thus it does not find a violation.

Plaintiff also contends that the Project is inconsistent with the adaptive management approach to forest management that the RRP prescribes. See P. Rep. at 3–7. While Plaintiff is correct that adaptive management receives special emphasis in the 2011 RRP, these objectives do not impose mandatory requirements on the USFS for specific projects. The RRP explains:

> In order to deal with uncertainty and risk the Service will employ an active

program of adaptive management. Adaptive management includes identifying areas of uncertainty and risk, implementing a research and monitoring approach to clarify these areas, and making decisions to change management direction that is not working while still maintaining management flexibility. <u>Where possible</u>, the implementation of the recovery actions included within this Revised Recovery Plan <u>should</u> be designed in a manner that provides feedback on the efficacy of management actions such that the design of future actions can be improved.

FS–4260 (emphasis added). Adaptive management is thus a tool that the FWS intends to use to gather knowledge for best managing the species. See FS–4262. FS–4280. The Court cannot read these objectives to require that every project be implemented with "rigorous monitoring and [an] adaptive management program" attached. See P. MSJ at 4. Again, there is no violation.

In its Reply, Plaintiff argues that the cutting of larger trees and simplification of vertical and horizontal structures violate the 2011 RRP. P. Rep. at 5–6. The Court finds that the sections Plaintiff cites are also cast as "recommendations" and do not impose mandatory obligations on the USFS. See, e.g., FS–4253 ("In order to reduce or not increase this potential competitive pressure while the threat from barred owls is being addressed, this Revised Recovery Plan now recommends conserving and restoring older, multi-layered forest across the range of the spotted owl."). The USFS did not violate the RRP for these reasons either.

The Court finds that the USFS did not violate the NFMA on Plaintiff's argued basis.

## IV. ORDER

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment on the First Claim for Relief (Failure to Take a Hard Look) and the Fourth Claim for Relief (Failure to Develop a Reasonable Range of Alternatives) of the Second Amended Complaint. ECF No. 65. The Court DENIES the motion with respect to the remaining Claims for Relief and thus GRANTS Defendants' and Intervenor's Cross Motions for Summary Judgment on the Second, Third, Fifth, Sixth, Seventh, Eighth, and Ninth Claims for Relief, and the Supplemental Complaint, ECF No. 102. The Court will issue a separate Order regarding the relief/remedy to be imposed after receipt and consideration of the parties' supplemental briefs on this issue.

IT IS SO ORDERED.